**In re Robert E. HEILMAN and Randi S. Heilman, Debtors.**

**Joseph J. Spinoso, et ux, Plaintiffs,**

**v.**

**Robert E. Heilman, et ux, Defendants.**

**Bankruptcy No. 94–5–5320–JS.**
**Adversary No. 95–5401–JS**

United States Bankruptcy Court, D. Maryland, Baltimore Division.

Oct. 26, 1999.

Howard M. Heneson, Law Offices of Howard M. Heneson, P.A., Baltimore, Maryland, for plaintiffs.

Michael R. McCann, Funk and Bolton, P.A., Baltimore, Maryland, for defendants.

Terry L. Musika, Baltimore, MD, Chapter 7 Trustee.

## MEMORANDUM OPINION DISMISSING COMPLAINT AND DETERMINING DEBT TO BE DISCHARGEABLE

JAMES F. SCHNEIDER, Bankruptcy Judge.

The instant complaint to determine dischargeability of debt was brought by homebuyers against a homebuilder. At the conclusion of the plaintiffs' case, the defendants' motion to dismiss the complaint was granted.

This opinion answers the following questions: Did the owner of a custom home construction company which failed to deliver a completed house to the plaintiffs as promised commit fraud or defalcation while acting in a fiduciary capacity, or larceny or embezzlement? Did Maryland statutory law convert him into a fiduciary for purposes of preventing him from discharging the debt his company incurred to the plaintiffs? May State law expand the meaning of the term "fiduciary capacity" employed in Section 523(a)(4) as interpreted by the Federal courts? What factors must a Federal court sitting in bankruptcy consider in determining whether a debtor was acting in a "fiduciary capacity" for the purpose of excepting from discharge a debt incurred through fraud or defalcation by a fiduciary?

## FINDINGS OF FACT

Robert Heilman was the chief operating officer of Specialty General Contractors, an unincorporated sole proprietorship that he founded in 1973, which was engaged in new home construction in Maryland. His wife, Randi Heilman, was an art teacher in a public elementary school.

Joseph J. Spinoso and his wife, Christine Anderson Spinoso "Spinosos" are the plaintiffs in this lawsuit who contracted with Mr Heilman's company for the construction of a custom home. Mr. Spinoso, who was employed for more than twenty years by a public utility company as a distribution analyst; had a high school education and one year of college. Mrs. Spinoso was employed since 1978 as a sales representative for an aluminum manufacturing company, and before that had worked at a hospital as a phlebotomist.

### CHRONOLOGY

During the summer of 1991, Joseph and Christine Spinoso admired a house that they later learned had been built by a company owned by Robert Heilman. Before that time, they had neither met Mr. Heilman, nor had they ever had any busi-

ness dealings with him or his company. They found out where Mr. Heilman lived, called him on the telephone, and arranged to meet him at his home, where they introduced themselves to him and his wife, Randi Heilman. While Mrs. Heilman served them milk and cookies in the kitchen, Mr. Heilman showed the Spinosos the plans for the house they had admired.

By a contract dated July 14, 1991, the Spinosos agreed that Mr. Heilman's company would build them a house similar to the one they had admired. On behalf of Specialty, Mr. Heilman promised to construct a house for the Spinosos on a lot located at 10 Darney Court in Kingsville, Maryland, for a price of & 210,000, pursuant to a contract between the Spinosos and Specialty. Joint Ex. 1. The Spinosos paid a $10,000 deposit to Mr. Heilman on behalf of Specialty.

On September 30, 1991, the Spinosos and Mr. Heilman executed a second, more detailed contract for the construction of the same house for a price of $214,400. Joint Ex. 2.

On May 6, 1992, the contract was amended, at which time the Spinosos paid an additional deposit of $10,000. Joint Ex. 3.

The business of building custom homes,[1] in which Specialty General Contractors was engaged,[2] was governed by the Maryland Custom Home Protection Act, Md. Real Prop.Code Ann. §§ 10–501 to 10–509, which the Maryland General Assembly enacted in 1986. The Act required that custom home contracts contain a number of provisions, including disclosures and certifications by the builder. The contracts entered into by the parties in this case did not contain any such disclosures or certifications.[3] In fact, the sloppy, hand-written

---

1. "Custom home" is defined by the Act as "a single-family dwelling constructed for the buyer's residence on land currently or previously owned by the buyer." Md. Real Prop. Code Ann. § 10–501(c).

2. The Act defines "custom home builder" as "any person who seeks, enters into, or performs custom home contracts." 10–501(d). "Custom home contracts" are defined as "any contract entered into with the buyer, with a value equal to or greater than $20,000, to furnish labor and material in connection with the construction, erection, or completion of a custom home." § 10–501(e). "Buyer" is defined as "any person who seeks or enters into a contract for the construction of a custom home." § 10–501(b). The term "person" is defined to include "an individual, corporation, business trust, estate, partnership, association, 2 or more persons having a joint or common interest, or any other legal or commercial entity." § 10–501(h).

3. §§ 10–505 and 10–506 of the Act provides as follows:

> **§ 10–505. Contracts between custom home builders and buyers.**
> Every custom home contract between a custom home builder and the buyer must be in writing. The custom home contract shall:
> (1) Include a draw schedule that shall be set forth on a separate sheet of paper and

that shall be separately signed by the buyer and the custom home builder;
> (2) Require the custom home builder, on written request of the buyer, to identify to the extent known the names of the primary subcontractors who will be working on the custom home;
> (3) Expressly state that any and all changes that are to be made to the contract shall be recorded as "change orders" that specify the change in the work ordered and the effect of the change on the price of the house;
> (4) Set forth in bold type whether or not the vendor or builder is covered by a warranty program guaranteed by a third party;
> (5) Require the vendor or builder, upon written request of the purchaser, to deliver to the purchaser within 30 days after each progress payment a list of the subcontractors or materialmen who have been paid more than $500 by the vendor or builder; and
> (6) Require that the custom home builder provide waivers of liens from all applicable subcontractors, suppliers, or materialmen within a reasonable time after the final payment for the goods or services they provide. § 10–505.

> **§ 10–506. Same—Disclosures.**
> (a) *Buyer's risk under mechanics' lien laws.*—(1) A custom home builder must include in each custom home contract a disclosure concerning the buyer's risk under mechanics' lien laws.

(2) The disclosure concerning the buyer's risk under mechanics' lien laws under paragraph 3 of this subsection shall:

(i) Be on a separate page of the custom home contract; and

(ii) Be separately signed by the buyer.

(3) The disclosure required under paragraph (1) of this subsection shall state:

"Buyer's risk under mechanics' lien laws unless you take certain steps to protect your interests, a subcontractor, materialman, or supplier may become entitled to place a lien against your property in order to ensure payment to him for services rendered or goods delivered on or to your home. This could mean that your home could be sold to satisfy the lien.

You may protect against such a possibility by:

(1) Promptly paying incremental amounts due under the contract and requiring an express accounting from your contractor of the goods and/or services that are covered by each payment; and

(2) Requesting that your contractor provide you with waivers of liens from all applicable subcontractors, suppliers, or materialmen within a reasonable time after you have made payment for the goods or services they provide."

(b) *Certification by builder.*—(1) A custom home builder shall include in each custom home contract a certification by the builder.

(2) The certification by the builder under paragraph (3) of this subsection shall be:

(i) On a separate page of the custom home contract; and

(ii) Separately signed by the buyer.

(3) Except as provided under paragraph (4) of this subsection, the certification required under paragraph (1) of this subsection shall state:

"CERTIFICATION BY BUILDER

I (name of builder) hereby certify that to the best of my knowledge, both I and any business entity in which I had an ownership interest in excess of 51 percent have not:

(1) Within the past 3 years been adjudged by a court of competent jurisdiction in Maryland to have failed to comply with any provisions of the Custom Home Protection Act or the Consumer Protection Act as it applies to the construction of new homes;

(2) Been adjudged liable for a final judgment in connection with a custom home contract, which judgment currently remains unsatisfied."

(4) If a custom home builder is unable to execute the certification under paragraph (2) of this subsection truthfully, then another certification, required under subparagraph (1) of this subsection shall be substituted, which shall state:

"CERTIFICATION BY BUILDER

I (name of builder) hereby certify that to the best of my knowledge, the information provided below includes all instances in which I or any business entity in which I had an ownership excess of 51 percent have:

(1) Within the past 3 years been adjudged by a court of competent jurisdiction in Maryland to have failed to comply with any provisions of the Custom Home Protection Act or the Consumer Protection Act as it applies to the construction of a new home;

(2) Been adjudged liable for a currently unsatisfied judgment in connection with a custom home contract.

Adverse adjudication(s):

( ).

Unsatisfied judgment(s):

( )."

(c) Escrow account requirement notice.—

(1) A custom home builder shall include in each custom home contract an escrow account requirement notice under paragraph (3) of this subsection.

(2) The escrow account requirement notice under paragraph (3) of this subsection shall:

(1) Be on a separate page of the custom home contract; and

(ii) Be separately signed by the buyer.

(3) The escrow account requirement notice required under paragraph (1) of this subsection shall state:

"ESCROW ACCOUNT REQUIREMENT

Unless your contract is financed by a mortgage issued by a federally-chartered financial institution or a financial institution supervised under the Financial Institutions Article of the Annotated Code of Maryland, or unless all deposits, escrow money, binder money, or any other money paid in advance, or is paid to the licensed real estate broker, to be held in the escrow account of the broker, Maryland law requires that all consideration exceeding 5 percent of the total contract price which is paid by a buyer to a custom home builder in advance of the completion of the labor, or the receipt of the materials for which the consideration is paid shall be deposited in an escrow account sand paid out of that account only for certain purposes specified by law. To ensure this, the law requires that your builder may only accept such payment in the name of the escrow account. Thus, you should make out your check to "(name of builder), escrow account". Records of payments out of this account must be carefully maintained by your builder, and the builder must permit you reasonable access to escrow account records. Your builder, however, may

contracts drafted by Mr. Heilman did not even bear the title of "contract" but were each entitled "Proposal."[4] They did not set forth a date when construction of the house would commence or be completed. The contracts made no reference to any applicable statutory requirements.

For their part, the Spinosos were naive, uninformed and gullible. They made no inquiry into the financial condition or fiscal responsibility of Specialty or Mr. Heilman before paying him two deposits totalling $20,000. Despite their lack of familiarity with the formalities required in agreements for the construction of custom homes, including the built-in protections for custom home buyers provided by State law, the Spinosos entered into the first three agreements and a later agreement without obtaining expert legal advice in advance.

The Spinosos alleged that none of the $20,000 in deposits they paid to Mr. Heilman went into the construction of the house. Mr. Heilman disagreed and contended that some of the money went to pre-construction expenses, including assisting the buyers in selecting an appropriate piece of ground upon which to build the house. Nevertheless, in June, 1992, in response to Mr. Spinoso's inquiry as to the reason construction had not yet begun, Mr. Heilman told him that he did not have any funds.

Meanwhile, the Spinosos applied to Patapsco Federal for a construction loan, which was approved. However, two weeks after they had paid Mr. Heilman the second $10,000 deposit, the Spinosos were informed by Patapsco that it would not approve Mr. Heilman's company as the builder. At that time, Mr. Heilman was building a house for a Dr. and Mrs. Joseph P. Connelly, Jr., for which Patapsco was the construction lender. Patapsco would

not agree to permit Mr. Heilman's company to begin building the Spinosos' house until the Connellys house was finished. By this time, the Spinosos were well aware that Mr. Heilman was having financial difficulties because he had informed them that he had no funds on hand to begin construction of their house and because of Patapsco's refusal to lend them money based upon their choice of Mr. Heilman's company as the builder.

Nevertheless, the Spinosos obtained a $190,000 construction loan from Northfield Federal Savings Bank to finance the construction of the house by Mr. Heilman's company. Joint Ex. 6. Before the Northfield loan was obtained, Mr. Heilman told the Spinosos that he had spent the two deposits totaling $20,000 on the construction of the Connellys' house.

Ronald Jobson, the executive vice president and loan officer for Northfield testified at trial that the parties presented him an executed contract and a draw schedule that had been drafted by Mr. Heilman and agreed to by the parties. The draw schedule seemed unusual to Mr. Jobson because it appeared that the builder's profit had been paid up front in the form of the $20,000 deposit, rather than being paid at the end in the last draw as a retainage, and also because some of the earliest draws appeared to be excessive. He said that the draws should only be enough to cover the costs of materials, payments to subcontractors, and a small salary for the builder. Mr. Jobson estimated that a typical profit for the builder on a $210,000 construction contract would be in the range of 16–19% of the contract price. He said that he communicated his concerns to the Spinosos, who nevertheless proceeded with their request to fund a construction loan in accordance with the contract and draw schedule.

---

choose to establish a separate escrow account for your project which will require your signature for any withdrawals." (1986, ch. 853; 1987, ch. 11, Section 1; 1987, chs. 520, 529).

4. Mr. Ronald Jobson, the loan officer who approved the Spinoso's construction loan, testified that it is usual for homebuilding contracts drafted by contractors to be of poor quality.

The loan amount was disbursed periodically to Specialty as construction proceeded, according to the draw schedule, pursuant to which eight payments were to be made to Specialty during the course of construction. These payments ranged from $11,000 to $45,000. Joint Ex. 8.

On July 13, 1992, the parties executed a third contract. Joint Ex. 4. Appended to the contract was the draw schedule, which identified eight draws totaling $190,000. The Spinosos executed a fixed rate note to Northfield and a Construction Trust Agreement dated September 1, 1992. Joint Ex. 6 and 7.

More than a year after the first contract was signed, construction on the house had not yet commenced. By this time the Spinosos began to be worried and finally decided to seek legal advice. They showed the contracts they had signed to Jeffrey D. Silverberg, Esquire, an attorney, who advised them to take action to protect their interests in light of the vagueness of the agreements with Specialty. Part of his advice to them was that they insist that the Heilmans personally guarantee the successful completion of the house.

Accordingly, on August 27, 1992, at the Spinosos' demand, Mr. and Mrs. Heilman executed an indemnity mortgage drafted by Mr. Silverberg as an encumbrance upon their residence in favor of the Spinosos in the principal sum of $200,000. Joint Ex. 5. The mortgage recited the fact that the property was already encumbered by a first lien in favor of Statewide Capital Corporation. The purpose of the mortgage was set forth in paragraphs 2 and 3:

WHEREAS, Specialty General Contractors and Remodeling (hereinafter "Specialty") and the mortgagees hereto are the parties to a certain contract dated May 6, 1992, under which contract the said Specialty agreed and covenanted to build a home for the Mortgagees on their property known as 10 Darney Court, Baltimore County, Maryland, at a total cost of $214,400.00, the Mortgagees having made a deposit of $20,000.00 at the time of the execution thereof, and the total cost having been reduced to $210,000.00 by a subsequent amendment between the parties;

AND WHEREAS, the mortgagors, in order to induce the mortgagees to remain in said contract have agreed to guarantee the completion of the home and the proper application of the deposit and all further monies allocated to Specialty, and to indemnify the said mortgagees in the event the said Specialty fails to perform and complete its obligations under the terms of said contract.

Joint Ex. 5.

Mr. Spinoso testified that he would not have proceeded with the contract with Specialty if the Heilmans had not executed the indemnity mortgage. Mr. Spinoso also testified that Mr. Heilman assured him that all monies paid by the Spinosos would go into the construction of the house, and that Mr. Spinoso relied upon Mr. Heilman's assurances.

The indemnity mortgage that the Heilmans executed after the deposits were spent was the only document that Mrs. Heilman signed in connection with this case. She did not sign any of the contracts between the Spinosos and Specialty. She was neither an officer nor an employee of Specialty.

In September, 1992, construction began. By October 2, 1992, when Northfield released the first draw to Specialty in the amount of $11,000, the foundation had been dug and the cement poured to construct the driveway. Joint Ex. 9. Work proceeded smoothly for the first four or five months. At one point, Mr. Heilman informed the Spinosos that construction was one month ahead of schedule. On February 11, 1993, when the sixth draw was released, a total of $156,000 had been paid by Northfield to Specialty. Joint Ex. 9. However, in March, 1993, construction stopped.

Northfield did not agree to pay Specialty any more money based upon the

amount of work completed after the sixth draw was released. According to the plaintiffs, by the date of the sixth draw, Specialty should have installed plumbing, heating, electricity, trim, windows, cabinets and woodwork. They claimed that the final work required by the sixth draw had not been completed. However, the plaintiffs submitted a series of photographs that depicted the house as appearing nearly complete on the exterior at the time of the sixth draw, after which construction stopped in the spring of 1993. Plaintiffs' Ex. 36. According to Mr. Spinoso, the house was merely a shell, with exterior walls, doors, windows and roof. He said there was no brick work on the outside or drywall on the inside. On cross-examination, however, Mr. Spinoso contradicted his earlier testimony given on direct examination by saying that the work required up through the sixth draw *was* complete. Mr. Jobson testified that the work remaining to be performed after the sixth draw included grading, brickwork, drywall, painting, tilework, installation of kitchen appliances and rugs. Without objection, he estimated that the value of the work performed up to that point was $135,000.

The parties stipulated that the first six draws were properly released, but the plaintiffs contended that the draws do not govern the case. For instance, they argued that the mere fact that the sixth draw was properly released did not prove that $156,000 worth of work was actually performed on the house.

In the spring of 1993, Mr. Heilman informed the Spinosos that Specialty was out of money and that the house could not be completed for the remaining $34,000 of construction loan proceeds. He advised the Spinosos that about $35,000 worth of construction work remained. According to

Mr. Heilman's testimony, he told the Spinosos, "I've sold my personal things to feed my family and I need some money or I can't come here." In response, the Spinosos made additional payments to Mr. Heilman. After August 1993, Mr. Heilman claimed he had no other income.

After the Spinosos borrowed additional money from Family members and others, Mr. Heilman returned to work in August, 1993, and remained on the job until the house was nearly complete in the spring of 1994. In addition to Mr. Heilman, the Spinosos employed other subcontractors to work on the house and paid them directly. The parties submitted an itemized list of expenses totaling $93,847.02, incurred by the Spinosos after August, 1993, Joint Ex. 11.[5]

The Spinosos testified that they kept Mr. Heilman on the job after he ran out of money because he assured them that he could finish the house and that he would reimburse them for any expenses they incurred outside the contract.

Two draws remained unreleased from the Northfield loan. The seventh draw required that drywall be complete and ready for paint. The eighth draw required that construction of the house be complete, a use and occupancy permit be furnished, and a release of liens be signed and notarized. Mr. Spinoso contended that there were additional unfinished items other than those called for in the seventh and eighth draws, including a lack of exterior siding and interior walls.

On January 14, 1994, the seventh draw was released to Mr. and Mrs. Spinoso. On July 8, 1994, the eighth draw was released to Mr. and Mrs. Spinoso. The final two draws totalled $34,000.

**5.** The Spinosos filed a statement of claim in the bankruptcy case in the amount of $90,-687.32, representing a small reduction by the Spinosos of the original amount claimed of $93,847.02. Exhibit 34. They also submitted a collection of invoices and receipts evidencing expenses they incurred, not including such items as carpet allowances. Plaintiffs' Ex. 10. The Spinosos paid separately for additional work that was done on the house and did not include those expenses in the claim.

In the spring of 1994, construction of the house was nearly complete, except for sidewalks, final grading and seeding and a covered, screened-in porch.

On August 18, 1994, the debtors, Robert and Randi Heilman, filed a Chapter 13 bankruptcy petition in this Court. On May 25, 1995, the case was converted to a Chapter 7 liquidation. The debtors' inability to make current payments on their mortgage resulted in the lifting of the automatic stay by this Court and the sale of their home at foreclosure. On July 14, 1995, the Chapter 7 trustee filed a report of no distribution [P. 64].

On August 29, 1995, the plaintiffs, Joseph Spinoso and Christine Anderson Spinoso, filed the instant complaint objecting to dischargeability of debt. On September 9, 1996, the complaint was amended at trial to request that the subject debt in the amount of $90,687.32 be determined to be nondischargeable pursuant to Section 523(a)(2)(A), (a)(4), and (a)(6) of the Bankruptcy Code.[6] The complaint specifically alleged "wrongful conversion of the proceeds of Plaintiffs' construction loan for his own purposes," "fraud and defalcation while acting in a fiduciary capacity as concerns his use of the proceeds of the Plaintiffs' construction loan," and "embezzlement of proceeds of Plaintiffs' construction loan." Complaint [P. 1] ¶ 17. The amount of the debt claimed represented the difference between the contract price of constructing the house that Mr. Heilman promised to build and the actual cost of completion that the plaintiffs incurred.

**6.** The instant complaint was brought pursuant to Section 523(a)(2)(A), (a)(4) and (a)(6) of the Bankruptcy Code, which provides:

> **§ 523. Exceptions to discharge.**
> (a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—
> * * *
> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—
> (A) false pretenses, a false representation, or actual fraud, other than a statement re-

## CONCLUSIONS OF LAW

To sustain their burden of proof that the debt is nondischargeable under the cited statute, the plaintiffs must prove the required elements by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). Exceptions to discharge are strictly construed against creditors for the purpose of protecting a debtor's fresh start. *Stanley H. Silverblatt Elec. Contr., Inc. v. Marino, (In re Marino)*, 115 B.R. 863 (Bankr.D.Md.1990); *Super Concrete Corp. v. Shipe (In re Shipe)*, 41 B.R. 584 (Bankr. D.Md.1984).

The complaint must be dismissed as to Randi Heilman because she committed no misconduct that contributed to the plaintiffs' loss, as they have acknowledged.

Because the applicable subsections of Section 523(a) are not mutually exclusive, *Tallant v. Kaufman (In re Tallant)*, 218 B.R. 58 (9th Cir. BAP 1998), this opinion addresses subsections (a)(2), (a)(4) and (a)(6) in sequence.

The plaintiffs are not entitled to prevail under Section 523(a)(2)(A) because they have failed to prove by a preponderance of the evidence that Mr. Heilman obtained the money by (1) "false pretenses," (2) "a false representation," or (3) "actual fraud." *See* 11 U.S.C. § 523(a)(2)(A). The plaintiffs cannot prove that the failure to perform the contract was fraudulent. In order to render the instant debt nondischargeable on that ground, the defendant must have commit-

> specting the debtor's or an insider's financial condition;
> * * *
> (4) for fraud or defalcation while acting in a fiduciary capacity, or embezzlement, or larceny;
> * * *
> (6) for willful and malicious injury by the debtor to another entity or to the property of another entity[.]
> 11 U.S.C. § 523(a)(2)(A), (4), and (6) (1999 Supp.)

ted a tort in connection with the receipt of the plaintiffs' money and must have failed to build a house for the plaintiffs as promised. Without the commission by the debtor of some tortious conduct, the Court is left with a cause of action for breach of contract which will not survive the debtors' discharge. Mr. Heilman's failure to deliver a completed house to the plaintiffs was a· breach of the contract, but did not amount to actual fraud or misrepresentation. Likewise, there is no evidence that the debtors' execution of the indemnity mortgage on their residence in favor of the Spinosos was in any sense a fraudulent misrepresentation. On the contrary, it was a good faith effort on their part to indemnify the plaintiffs against future losses if Specialty failed to perform the contract, in the nature of a personal guaranty. The debtors did not induce the plaintiffs to enter into the mortgage, but rather, it was the plaintiffs who insisted that the debtors execute the mortgage and presented the very mortgage prepared by their attorney for the debtors to sign.

■ To sustain an action under Section 523(a)(2)(A), the plaintiffs must prove the following five elements:

(1) that the debtor made a representation;

(2) that at the time the debtor knew the representation was false;

(3) that the debtor made the representation with the intention and purpose of deceiving the creditor;

(4) that the creditor relied on such representation; and

(5) that the creditor sustained loss and damage as the proximate result of the representation.

*Hecht's v. Valdes (In re Valdes),* 188 B.R. 533, 535 (Bankr.D.Md.1995); *Wilcoxon Constr., Inc. v. Woodall (In re Woodall),* 177 B.R. 517, 519–20 (Bankr.D.Md.1995); *Heinrich v. Goodyear Tire and Rubber Co.,* 532 F.Supp. 1348 (D.Md.1982) (elements of pleading fraud in Maryland), *citing Parish v. Maryland & Virginia Milk*

*Producers Ass'n, Inc.,* 250 Md. 24, 72–73, 242 A.2d 512 (1968), *appeal after remand,* 261 Md. 618, 277 A.2d 19, *cert. denied,* 404 U.S. 940, 92 S.Ct. 280, 30 L.Ed.2d 253 (1971).

■ The creditor's reliance on the debtor's representation must be "justifiable," rather than "reasonable." *Field v. Mans,* 516 U.S. 59, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995). Under the following facts and circumstances of the instant case, the Spinosos' reliance upon Mr. Heilman's statements of intention to perform was not justifiable because (1) they had never had any past dealings with him before they gave him $20,000; (2) their unfamiliarity with the requirements of custom home construction contracts; (3) the numerous warnings they failed to heed regarding the precarious financial condition of Mr. Heilman's company, including the refusal of one lender to grant a construction loan if Mr. Heilman were the builder and the concerns expressed by the second lender that the builder's draw schedule was other than standard and unusually generous. No one with the background and experience of the Spinosos in education and the business world could maintain that they justifiably relied upon Mr. Heilman's statements.

Moreover, the Spinosos cannot prove that the statements made by Mr. Heilman were false when he made them. In conformity with *Field v. Mans,* in the case of *Foley & Lardner v. Biondo (In re Biondo),* 180 F.3d 126 (4th Cir.1999), the Fourth Circuit looked to the definition of "fraudulent misrepresentation" contained in the *Restatement (Second) of Torts* § 525 (1976):

> One who fraudulently makes a misrepresentation of fact, opinion, intention or law for the purpose of inducing another to act or to refrain from action in reliance upon it, is subject to liability to the other in deceit for pecuniary loss

caused to him by his justifiable reliance upon the misrepresentation.

180 F.3d at 134.

■■■ "Actual fraud," as the term is employed in Section 523(a)(2)(A), is defined as "any deceit, artifice, trick or design involving direct and active operation of the mind, used to circumvent and cheat another—something said, done or omitted with the design of perpetrating what is known to be a cheat or deception." *Woodall*, 177 B.R. at 523, *citing Stanley H. Silverblatt Elec. Contractor, Inc. v. Marino (In re Marino)*, 139 B.R. 380, 383 (Bankr.D.Md.1992). "[T]he fraud must have existed at the time of, and been the methodology by which, the money, property or services were obtained." *Woodall*, 177 B.R. at 523. Later misrepresentations are irrelevant for purposes of determining dischargeability under Section 523(a)(2)(A). *Id.* at 524. In addition, the fraudulent conduct must involve moral turpitude or intentional wrongdoing as opposed to fraud implied in law. *Id.; Super Concrete Corp. v. Shipe (In re Shipe)*, 41 B.R. 584 (Bankr.D.Md.1984); *Neal v. Clark*, 95 U.S. (5 Otto) 704, 24 L.Ed. 586 (1877).

■■■ In the instant case, because there was no misrepresentation, there can be no actual reliance. At most, the plaintiffs have demonstrated only a breach of contract, namely that the cost of the building that Mr. Heilman agreed to construct exceeded the amount that had been agreed upon, and that he failed to complete the house he promised to build. *Parker v. Columbia Bank*, 91 Md.App. 346, 604 A.2d 521 (1992) (in Maryland, a duty of good faith and fair dealing is an implied term in certain contracts and requires parties to exercise good faith in performing their contractual obligations). However, a mere breach of contract does not render a debt nondischargeable under Section 523(a)(2)(A), even when the breach is wrongful. For a breach of contract to result in a nondischargeable debt, the debtor must have misrepresented his or her intention to perform contractual duties, which may be inferred if the debtor failed to begin performance. *Cf. FCC National Bank First Card v. Friend (In re Friend)*, 156 B.R. 257 (Bankr.W.D.Mo. 1993); *Jokay Co. v. Mercado (In re Mercado)*, 144 B.R. 879 (Bankr.C.D.Cal.1992); *Merchants Nat. Bank & Trust Co. of Indianapolis v. Pappas (In re Pappas)*, 661 F.2d 82 (7th Cir.1981). In other words, there must be a present intention not to perform when the future performance is promised. *Cf. Lawyers Title Ins. Corp. v. Pitt*, 157 B.R. 585 (E.D.Va.1991) (continued use of false affidavits that were true when executed to procure draws amounted to a misrepresentation; "an overt misrepresentation is not a necessary predicate for satisfying the scienter element under § 523(a)(2)(A) when it is clear that the party had no intention of performing.").

The Court finds the debtor's testimony to be credible and finds that it was his intention to fully perform his duties under the contracts when Mr. Heilman signed them and accepted the monies from the Spinosos. It is beyond dispute that Mr. Heilman did not induce the Spinosos to enter into the contracts. Rather, the Spinosos sought out Mr. Heilman and initiated the contracts between them. His oral statements regarding his economic ability to perform the contract are not actionable. The Spinosos permitted him to continue to work on the project, despite their knowledge that he had spent the deposits and that he was impecunious. The Court concludes from Mr. Heilman's renewed efforts to complete performance that he did not misrepresent his intention to perform. Mr. Heilman rendered part performance of the contract. The debt in question did not arise out of any fraud or misrepresentation. Mr. Heilman and the Spinosos entered into contracts based upon the good faith promises each made to the other. The record supports the inference that Mr. Heilman had every intention of fully performing the contracts at the time he obligated his company.

The damages claimed by the plaintiffs representing the cost of completing the house confirm the opinion of this Court that this is an action for breach of contract, not one for defalcation of funds by a fiduciary. The contracts were for both labor and materials, and contemplated some margin of profit for Mr. Heilman. The contracts at issue did not obligate the defendant to dedicate the deposits he was paid to the purchase of construction materials for the house.

Chief Judge Mannes of this Court has held in *AT & T Universal Card Services Corp. v. Trivisani (In re Trivisani)*, 225 B.R. 319 (Bankr.D.Md.1998), a case brought under Section 523(a)(2)(A), that subjective intention not to repay a debt must be inferred from a totality of the circumstances, and not merely from a debtor's objective inability to do so. As the opinion aptly stated:

Plaintiff contends that the debtor made two implicit representations: (1) that he had the ability to repay the money he borrowed, and (2) that he had the intention to do so. The first representation has no significance because fraud claims based on this kind of representation are not relevant under § 523(a)(2)(A) of the Bankruptcy Code. *In re Van Steinburg*, 744 F.2d 1060 (4th Cir.1984). The court finds as a fact that, at the time the money was borrowed, the debtor intended to repay it. The court finds no present intention not to perform. *See Miller v. Fairchild Indus.*, 97 Md.App. 324, 342–43, 629 A.2d 1293, 1302–03 (1993), (where the Court of Special Appeals of Maryland explained that predictions or promissory statements are not fraudulent representations). *See Palmacci v. Umpierrez*, 121 F.3d 781, 788 (1st Cir.1997) ("A 'dumb but honest' defendant does not satisfy the test of scienter.") (citation omitted).

---

7. At the time the events in the instant case occurred, The Trust Relationships statute pro-

\* \* \*

While assumption of the risk is no defense to a dischargeability action, plaintiff had it within its power, through more careful underwriting, to avoid dealing with this debtor who was in such a precarious financial situation.

225 B.R. at 320, 322. In spite of their knowledge that the debtor had spent all of the deposit before the plaintiffs entered into the latest contract with his company, the Spinosos continued to deal with him.

 The debt may not be excepted from discharge under Section 523(a)(4) because the plaintiffs have not proven that the debt arose out of (1) "fraud or defalcation while acting in a fiduciary capacity," (2) "embezzlement," or (3) "larceny." *See* 11 U.S.C. § 523(a)(4). "[T]his discharge exception 'was intended to reach those debts incurred through abuses of fiduciary positions and through active misconduct whereby a debtor has deprived others of their property by criminal acts; both classes of conduct involve debts arising from the debtor's acquisition or use of property that is not the debtor's.'" *Miller v. J.D. Abrams, Inc. (In Matter of Miller)*, 156 F.3d 598, 602 (5th Cir.1998), *quoting Boyle v. Abilene Lumber Co. (In re Boyle)*, 819 F.2d 583, 588 (5th Cir.1987).

The plaintiffs alleged that The Maryland Construction Trust Statute, Md. Real Prop.Code Ann. §§ 9–201 to 9–204 (1987), is applicable to this case and that by reason of its applicability the debtors are liable to the Spinosos for breach of fiduciary duty. The Maryland Construction Trust Statute purports to create a trust relationship between the contractor (or subcontractor) who has been paid by the owner and the subcontractor for whose work the owner has paid the contractor. Upon receiving payment from the owner, the contractor (or subcontractor) holds the funds in trust for the benefit of the subcontractor who performed work or provided materials for the project.[7]

vided:

However, the Court finds that the statute, by its own terms, only applies to State-financed buildings and to those subject to the Maryland mechanics' lien statute, Md. Real Prop.Code Ann. § 9–204. *United States ex rel. Allied Building Products Corp. v. Federal Insurance Co.,* 729 F.Supp. 477 (D.Md.1990); *Ferguson Trenching Co. Inc. v. Kiehne,* 329 Md. 169, 618 A.2d 735 (1993), and does not apply to "[a] contract for the construction and sale of a single family residential dwelling." Md. Real Prop.Code Ann. § 9–204.

The plaintiffs also contended that a debt arising from a violation of the Maryland Custom Home Protection Act, Md. Real Prop.Code Ann. §§ 10–501 to 10–509 (1986), is excepted from discharge because the statute created an express trust. The statute purported to create a trust for any consideration paid by a buyer to a custom home builder, subcontractor or supplier, and provided that the failure to perform under such a custom home contract or to pay the lawful claims of persons furnishing labor or materials created a rebuttable presumption that the consideration paid by the buyer was used in violation of the trust.[8]

There is no question that Mr. Heilman violated the terms of the Maryland Custom Home Protection Act, which imposes criminal liability. This Court holds, however, that the statute did not convert him into a fiduciary for purposes of nondischargeability under Section 523(a)(4).

It is an understatement to say that the courts are divided on the meaning of "fiduciary capacity" for purposes of nondischargeability of debts for fraud or defalcation while acting in a fiduciary capacity under 11 U.S.C. § 523(a)(4). Opinions are split as to attorneys,[9] corporate directors,

---

**§ 9–201 Moneys to be held in trust; commingling.**

(a) *Moneys to be held in trust.*—Any moneys paid under a contract by an owner to a contractor, or by the owner or contractor to a subcontractor for work done or materials furnished, or both, for or about a building by any subcontractor, shall be held in trust by the contractor or subcontractor, as trustee, for those subcontractors who did work or furnished materials, or both, for or about the building, for purposes of paying those subcontractors.

(b) *Commingling.*—(1) Nothing contained in this subtitle shall be construed as requiring moneys held in trust by a contractor or subcontractor under subsection (a) of this section to be placed in a separate account.

(2) If a contractor or subcontractor commingles money held in trust under this section with other moneys, the mere commingling of the moneys does not constitute a violation of this subtitle.

Md. Real Prop.Code Ann. § 9–201.

**8.** At the time the events in the instant case transpired, Sections 10–502 and 10–503 of the Maryland Custom Home Protection Act provided:

**§ 10–502. Payments to custom home builders held in trust.**

Any consideration received by a custom home builder in connection with a custom home contract shall be held in trust for the benefit of the buyer. Payments made to subcontractors or suppliers in connection with the custom home contract shall be consistent with the trust.

**§ 10–503. Same—Presumption of appropriation in violation of trust.**

Except with the express written approval of the buyer not to pay, in the event a subcontractor or supplier fails, in the opinion of the custom home builder, to perform in accordance with the contract between the subcontractor or the supplier and the custom home builder, the failure of a custom home builder to pay or cause to be paid the lawful claims of any person furnishing labor or material, including fuel, within a reasonable period after the receipt from the buyer of consideration paid to satisfy the claims, shall create a rebuttable presumption that the consideration received by the custom home builder has been used or appropriated in violation of the trust established by this subtitle.

Md. Real Prop.Code Ann. §§ 10–502 and 10–503.

**9.** ATTORNEYS: *Andy Warhol Foundation for Visual Arts, Inc. v. Hayes (In re Hayes),* 183 F.3d 162 (2d Cir.1999) (following the Eighth Circuit in holding that the attorney-client relationship, without more, constitutes a fiduciary relationship within the meaning of Section 523(a)(4)); *BCCI Holdings v. Clifford,* 964 F.Supp. 468 (D.D.C.1997) (breach of attorneys' ethical standards can constitute breach of fiduciary duty under District of Columbia

officers and shareholders,[10] general part- ners, limited partners, and joint ventur-

law); *Tudor Oaks Ltd. Partnership v. Cochrane (In re Cochrane)*, 124 F.3d 978 (8th Cir.1997) *cert. denied*, 522 U.S. 1112, 118 S.Ct. 1044, 140 L.Ed.2d 109 (1998) (attorney who represented partnership was fiduciary to partners); *R.E. America, Inc. v. Garver (In re Garver)*, 116 F.3d 176 (6th Cir.1997) (attorney-client relationship without more is insufficient to establish fiduciary relationship); *Weisberger v. Guth (In re Guth)*, 210 B.R. 294 (Bankr. N.D.Ohio 1997) (attorney who agreed to share fees was not fiduciary to another attorney); *Kaufman v. Tallant (In re Tallant)*, 207 B.R. 923 (Bankr.E.D.Cal.1997), *reversed in part*, 218 B.R. 58 (9th Cir. BAP 1998) (attorney was not fiduciary but could be held liable for fraud or misrepresentation); *Koenig v. Grotrian (In re Grotrian)*, 217 B.R. 1017 (Bankr.N.D.Ind.1997) (attorney-client relationship is fiduciary in nature); *Jacobs v. Pierce (In re Pierce)*, 208 B.R. 261 (D.Mass. 1997) (debtor-attorney was fiduciary under Massachusetts law); *In the Matter of Woldman*, 92 F.3d 546 (7th Cir.1996) (two lawyers who were joint venturers were not fiduciaries as to each other); *Fowler Bros. v. Young (In re Young)*, 91 F.3d 1367 (10th Cir.1996) (attorney was not fiduciary to construction company under New Mexico law); *Harsch v. Eisenberg (In re Eisenberg)*, 189 B.R. 725 (Bankr. E.D.Wis.1995) (ERISA violations by attorney who was pension plan administrator and trustee held breach of fiduciary duties); *Ducey v. Doherty (In re Ducey)*, 160 B.R. 465 (Bankr.D.N.H.1993) (attorney who defalcated retainer was fiduciary): *Braud v. Stokes (In re Stokes)*, 142 B.R. 908 (Bankr.N.D.Cal.1992) (lawyers who negligently permitted limitations to expire were not liable to clients as fiduciaries); *Schwalbe v. Gans (In re Gans)*, 75 B.R. 474 (Bankr.S.D.N.Y.1987) (an attorney acts in a fiduciary capacity to a client, but debt was dischargeable because debtor was not acting as an attorney when he borrowed money from plaintiffs' decedent); *Ehlenbeck v. Patton (In re Patton)*, 58 B.R. 149 (W.D.N.C.1986) (attorney was fiduciary whose embezzlement of funds entrusted to him by client for purchase of real estate); *Brawer v. Gelman (In re Gelman)*, 47 B.R. 735 (Bankr.S.D.Fla.1985) (State court judgment against debtor for legal malpractice was nondischargeable as debt for breach of fiduciary duty); *Cohen v. Sparrow (In re Sparrow)*, 30 B.R. 278 (Bankr.S.D.Fla.1983) (State court judgment based on debtor's mismanagement of funds in debtor's attorney escrow account belonging to plaintiff was nondischargeable as defalcation by a fiduciary); *In re Gelson*, 12 F.Supp. 924 (E.D.N.Y.1935) (an attorney who receives money which is the property of

his client does so while acting in a fiduciary capacity).

**10.** CORPORATE OFFICERS, DIRECTORS AND SHAREHOLDERS: *Mercedes Benz Credit Corp. v. Carretta (In re Carretta)*, 219 B.R. 66 (Bankr.D.N.J.1998) (principal of corporation was fiduciary to corporation's creditors upon insolvency of corporation); *Mid America Distribution Centers, Inc. v. Cato (In re Cato)*, 218 B.R. 987 (Bankr.M.D.Fla.1998) (corporate officer was not fiduciary to corporation); *M–R Sullivan Mfg. Co., Inc. v. Sullivan (In re Sullivan)*, 217 B.R. 670 (Bankr. D.Mass.1998) (under Arizona law, a corporate officer or director owes a fiduciary duty to the corporation); *Miramar Resources, Inc. v. Shultz (In re Shultz)*, 208 B.R. 723 (Bankr. M.D.Fla.1997) (corporate director became corporate fiduciary when corporation became insolvent under Delaware trust fund doctrine); *Energy Prods. Eng'g, Inc. v. Reuscher (In re Reuscher)*, 169 B.R. 398 (S.D.Ill.1994) (fiduciary duty of corporate officers and directors arises upon insolvency or dissolution of the corporation for purposes of nondischargeability of debt under 11 U.S.C. § 523(a)(4)); *Tricentrol Overseas, Ltd. v. Touchstone (In re Touchstone)*, 153 B.R. 955 (Bankr.S.D.Fla.1993) (fiduciary duty of corporate officer to corporation as to corporate property gave rise to technical trust, rather than implied or constructive trust, so as to render debt nondischargeable as defalcation as a fiduciary); *LaPointe v. Brown (In re Brown)*, 131 B.R. 900 (Bankr.D.Me.1991) (corporate officer was fiduciary to corporation); *Pan–Western Life Ins. Co. v. Galbreath (In re Galbreath)*, 112 B.R. 892 (Bankr. S.D.Ohio 1990) (director of corporation was a fiduciary); *Gillespi v. Jenkins (In re Jenkins)*, 110 B.R. 74 (Bankr.M.D.Fla.1990) (held, embezzlement but also defalcation while acting in a fiduciary capacity; debtor/president/sole shareholder of corporation was fiduciary to surety on public projects created by indemnity agreement, not by penal statute); *Mostiler v. Couch (In re Couch)*, 100 B.R. 802 (Bankr. E.D.Va.1988) (property management corporation and corporate officer who was 80% stockholder were fiduciaries for property owner and liable for defalcation); *Bakis v. Snyder (In re Snyder)*, 101 B.R. 822 (Bankr. D.Mass.1989), *aff'd in relevant part and rev'd in part on other grounds sub nom. Snyder v. Bornstein*, 923 F.2d 840 (1st Cir.1990), *cert. denied*, 500 U.S. 923, 111 S.Ct. 2030, 114 L.Ed.2d 115 (1991) (fiduciary duties of corporate director under state law satisfied requirements of Section 523(a)(4)); *Brown v. Beckett (In re Beckett)*, 96 B.R. 366, (Bankr.M.D.Fla. 1989) (corporate president not liable for em-

ers,[11] property managers,[12] insurance agents,[13] lottery

bezzlement); *Bernstein v. Carl Zeiss, Inc. (In re Bernstein)*, 78 B.R., 619 (S.D.Fla.1987) (breach of commercial transaction does not by itself establish fiduciary relationship; debtor was principal of closely-held corporation that sold medical equipment); *Driggs v. Black (In re Black)*, 787 F.2d 503 (10th Cir.1986) (majority shareholder in corporation did not have fiduciary duty toward individual minority shareholder, but to all other shareholders as a group); *Murphy and Robinson Inv. Co. v. Cross (In re Cross)*, 666 F.2d 873 (5th Cir. 1982) (no fiduciary relation between corporate officer and corporate creditor).

**11. PARTNERS, GENERAL AND LIMITED, AND JOINT VENTURERS:** *Schwager v. Fallas (In Matter of Schwager)*, 121 F.3d 177 (5th Cir.1997) (managing partner of a limited partnership is a fiduciary to the limited partners, but reversing lower court on other ground that collateral estoppel did not apply). *Lapin v. Glatstian (In re Glatstian)*, 215 B.R. 495 (Bankr.D.N.J.1997) (general partner of limited partnership is a fiduciary to the limited partners); *Holaday v. Seay (In re Seay)*, 215 B.R. 780 (10th Cir. BAP 1997) (Oklahoma cases finding fiduciary duty between joint venturers did not establish common law trust necessary to apply fiduciary fraud or defalcation discharge exception. "Neither a general fiduciary duty of confidence, trust, loyalty, and good faith, nor an inequality between the parties' knowledge and bargaining power, is sufficient to establish a fiduciary relationship for purposes of dischargeability," quoting *Fowler Bros. v. Young (In re Young)*, 91 F.3d 1367,1372 (10th Cir.1996)); *Schreibman v. Zanetti–Gierke (In re Zanetti–Gierke)*, 212 B.R. 375 (Bankr.D.Kan.1997) (partners are not fiduciaries under Kansas and Missouri law); *Krishnamurthy v. Nimmagadda (In re Krishnamurthy)*, 209 B.R. 714 (9th Cir. BAP 1997) (debtor-partners were fiduciaries of partners because under California law partners are fiduciaries); *Lewis v. Scott (In re Lewis)*, 97 F.3d 1182 (9th Cir.1996) (under Arizona law, partners are fiduciaries); *In the Matter of Woldman*, 92 F.3d 546 (7th Cir.1996) (two lawyers who were joint venturers were not fiduciaries); *Deodati v. M.M. Winkler & Associates (In re M.M. Winkler & Associates)*, 209 B.R. 397 (Bankr.N.D.Miss.1996) (debtor/general partner of corporate accounting firm); *Laughter v. Speight (In re Speight)*, 16 F.3d 287 (8th Cir.1994) (State court judgment against partner for breach of fiduciary duty was given collateral estoppel effect).; *LSP Investment Partnership v. Bennett (In re Bennett)*, 970 F.2d 138 (5th Cir.1992) (managing partner of a managing partner of a limited partnership held not to be a fiduciary to the

limited partners, even though a managing partner of a general partnership was a fiduciary to partners under Texas law); *Beebe v. Schwenn (In re Schwenn)*, 126 B.R. 351 (D.Colo.1991) (joint venturer was a fiduciary under Colorado common law and statutory law); *BAMCO 18 v. Reeves (In re Reeves)*, 124 B.R. 5 (Bankr.D.N.H.1990) (limited partners are not fiduciaries to each other for purposes of 11 U.S.C. § 523(a)(4)); *Stahl v. Lang (In re Lang)*, 108 B.R. 586 (Bankr.N.D.Ohio 1989) (general partner was not fiduciary to limited partners, but his investment of funds in high-risk investment rendered debt nondischargeable as willful and malicious injury); *Leeb v. Guy (In re Guy)*, 101 B.R. 961 (Bankr. N.D.Ind.1988) (general partner is fiduciary to limited partners); *Lewis v. Short (In re Short)*, 818 F.2d 693 (9th Cir.1987) (joint venturer who controlled affairs of joint venture was trustee whose defalcation rendered his debt nondischargeable as violation of fiduciary duty, under statute and actual agreement of the parties); *Ragsdale v. Haller (In re Ragsdale)*, 780 F.2d 794 (9th Cir.1986) (general partners in California are fiduciaries); *Clark v. Taylor (In Re Taylor)*, 58 B.R. 849 (Bankr. E.D.Va.1986) (existence of a partnership did not *per se* create a fiduciary relationship between the partners).

**12. PROPERTY MANAGERS:** *Otto v. Niles (In re Niles)*, 106 F.3d 1456 (9th Cir.1997) (clients' property manager who was also licensed real estate broker was fiduciary as trustee of express trust under California law); *Mostiler v. Couch (In re Couch)*, 100 B.R. 802 (Bankr.E.D.Va.1988) (property management corporation and corporate officer who was 80% stockholder were fiduciaries for property owner and liable for defalcation); *Oppenheimer v. Reder (In re Reder)*, 60 B.R. 529 (Bankr.D.Minn.1986) (borrower/property manager was not fiduciary to lender as no express trust existed).

**13. INSURANCE AGENTS:** *P.F.C. Mgt. Corp. v. Chomat (In re Chomat)*, 216 B.R. 681 (Bankr.S.D.Fla.1997) (reinsurance broker's shareholder who failed to obtain reinsurance and misappropriated premiums was not a fiduciary to insurance company from which he obtained premiums); *Employers Workers' Comp. Assn. v. Kelley (In re Kelley)*, 215 B.R. 468 (10th Cir. BAP 1997) (debtor-agent who collected insurance premiums for self-insurer might be fiduciary as administrator; remanded for that determination, but held, no common law trust); *Florida Dept. of Ins. v. Blackburn (In re Blackburn)*, 209 B.R. 4 (Bankr. M.D.Fla.1997) (debtor/officer of insurance

agents[14] and contractors, subcontractors and homebuilders.[15]

■ It is well-settled that the determination of fiduciary capacity is a question of

company was not fiduciary); *Quaif v. Johnson,* 4 F.3d 950 (11th Cir.1993) (insurance agent was fiduciary for purposes of § 523(a)(4)); *First State Ins. Co. v. Bryant (In re Bryant),* 147 B.R. 507 (Bankr.W.D.Mo. 1992) (debtors who were principals of "excess and surplus lines brokerage" were not fiduciaries to insurers, and failure to remit premiums was neither breach of fiduciary duty nor embezzlement.); *American Family Ins. Group v. Gumieny (In re Gumieny),* 8 B.R. 602 (Bankr.E.D.Wis.1981) (an insurance agent is not a fiduciary under any Wisconsin statute); *National Agents Serv. Co. v. Duiser (In re Duiser),* 8 B.R. 397 (Bankr.W.D.Va.1981) (an insurance agent was not fiduciary to insurance company which financed debtor's premium contracts); *Ealy Campbell Mobile Homes, Inc. v. Whitlock (In re Whitlock),* 449 F.Supp. 1383 (W.D.Mo.1978) (officer of corporate insurance agency occupied fiduciary position to insurer under agency contract).

14. LOTTERY SALES AGENTS: *Texas Lottery Comm'n v. Tran (In re Tran),* 151 F.3d 339 (5th Cir.1998), *reh'g denied,* 159 F.3d 1358 (1998) (Texas statute requiring lottery sales agents to hold proceeds from ticket sales in trust for the State did not give rise to a fiduciary obligation subjecting debtor to nondischargeability of debt); *Georgia Lottery Corp. v. Daniel (In re Daniel)* 225 B.R. 249 (Bankr.N.D.Ga.1998) (as retail seller of lottery tickets, debtor stood in a fiduciary relationship to the State); *State of New Jersey v. Kaczynski (In re Kaczynski),* 188 B.R. 770 (Bankr.D.N.J.1995) (lottery sales agent was fiduciary to the State of New Jersey under an express trust created by statute); *In the Matter of Marchiando,* 13 F.3d 1111 (7th Cir. 1994), *cert. denied,* 512 U.S. 1205, 114 S.Ct. 2675, 129 L.Ed.2d 810 (1994) (lottery sales agent was not fiduciary because Section 523(a)(4) reaches only those fiduciary obligations in which there is substantial inequality in power or knowledge in favor of a debtor seeking the discharge and against the creditor resisting discharge, and does not reach "a trust that has a purely nominal existence until the wrong is committed."); *Rhode Island Lottery Comm'n. v. Cairone (In re Cairone),* 12 B.R. 60 (Bankr.D.R.I.1981) (lottery sales agent was fiduciary for purposes of nondischargeability of debt while acting in a fiduciary capacity under Rhode Island statute).

15. CONTRACTORS, HOMEBUILDERS AND SUBCONTRACTORS: *Irr Supply Centers, Inc. v. Phipps (In re Phipps),* 217 B.R. 427 (Bankr. W.D.N.Y.1998) (bankruptcy court bound by precedent to hold nondischargeable debt of

general contractor who failed to comply with New York Lien Law); *AABCO Sheet Metal Co. v. Lincoln Center for the Performing Arts, Inc.,* 174 Misc.2d 232, 663 N.Y.S.2d 490 (N.Y.Sup. Ct.1997) (defalcation by general contractor who was a trustee under New York Lien Law renders debt nondischargeable as defalcation by a fiduciary); *Antlers Roof–Truss & Blders. Supply v. Storie (In re Storie),* 216 B.R. 283 (10th Cir. BAP 1997) (*held,* that debtor's failure to account for funds that had been entrusted due to any breach of a fiduciary duty, was defalcation, whether intentional, willful, reckless or negligent; did not decide if homebuilder was a fiduciary, but reversed on issue of whether defalcation had occurred); *Airtron, Inc. v. Faulkner (In re Faulkner),* 213 B.R. 660 (Bankr.W.D.Tex.1997) (Chapter 13 debtor/limited partner in real estate development company held not culpable as fiduciary to subcontractor); *Riden v. Sigler (In re Sigler),* 196 B.R. 762 (Bankr.W.D.Ky.1996) (contractor was not fiduciary under state statute requiring payment of subcontractors and suppliers, and statute did not create express trust); *Burt Bldg. Material Corp. v. Silba (In re Silba),* 170 B.R. 195 (Bankr.E.D.N.Y.1994) (general contractor was fiduciary as to lumberyard and debt was nondischargeable under New York Lien Law); *Hemelt v. Pontier (In re Pontier),* 165 B.R. 797 (Bankr.D.Md. 1994) (on motion to dismiss, *held* that complaint to determine nondischargeable debt against corporate officer of construction company was sufficient where the individual's fraud was an allegation); *Lawrence Steel Erection Co., Inc. v. Piercy (In re Piercy),* 140 B.R. 108 (Bankr.D.Md.1992) (fraud under the Maryland Construction Trust Statute is implied fraud or fraud in law, while Section 523(a)(4) requires positive fraud or fraud in fact. The standards for fraud and fiduciary capacity under the Maryland Construction Trust Statute fall short of the required elements of actual fraud and of a technical or express trust under 11 U.S.C. § 523(a)(4)). *Reed & Reed, Inc. v. Parks (in re Parks),* 141 B.R. 92 (Bankr. D.Md.1991) (contractor was fiduciary under Maryland statute based upon collateral estoppel); *Discount Home Ctr., Inc. v. Turner (In re Turner),* 134 B.R. 646 (Bankr.N.D.Okla.1991) (contractor was fiduciary under Oklahoma statutes); *Stanley Silverblatt Electrical Contractor, Inc. v. Marino (In re Marino),* 115 B.R. 863 (Bankr.D.Md.1990) (Maryland construction trust statutes did not impose fiduciary duty on corporate officers of contractor); *Woodworking Enter., Inc. v. Baird (In re Baird),* 114 B.R. 198 (9th Cir. BAP 1990) (contractor held to be fiduciary under Arizona

Federal law.[16]

However, a significant number of courts have held that State law must also be

statute which created express or technical trust); *CRL of Maryland v. Holmes (In re Holmes)*, 117 B.R. 848 (Bankr.D.Md.1990) (trust created in fact and not one implied by law is necessary for debt to be nondischargeable on the basis that it arises from breach of fiduciary duty; a contractor is not a fiduciary); *United States t/u/o Allied Bldg. Prods. Corp. v. Federal Ins. Co.*, 729 F.Supp. 477 (D.Md.1990) (general contractors and their subcontractors do not stand in a confidential relation to each other and the Maryland Construction Trust Statute held not applicable); *Boyle v. Abilene Lumber, Inc. (In re Boyle)*, 819 F.2d 583 (5th Cir.1987) (officer of corporate contractor not liable for corporate debts under trust fund statute because statute did not require segregation of funds); *In the Matter of Thomas*, 729 F.2d 502 (7th Cir.1984) (subcontractors were fiduciaries under Wisconsin statute); *Carlisle Cashway, Inc. v. Johnson (In re Johnson)*, 691 F.2d 249 (6th Cir.1982) (contractor was a fiduciary under the Michigan Building Contract Fund Act); *MacArthur Co. v. Crea (In re Crea)*, 31 B.R. 239 (Bankr.D.Minn.1983) (criminal statute relating to theft by contractor did not give rise to nondischargeable debt, and because statute contained no requirement of scienter, constructive trust imposed by statute did not give rise to fiduciary duty); *Vine v. Lotto (In re Lotto)*, 21 B.R. 767 (Bankr.E.D.Wis.1982) (Wisconsin theft by contractor statute imposed an express trust on contractors for the benefit of laborers, subcontractors and materialmen, but did not impose a fiduciary duty upon contractor to place down payment in a trust account) (*overruled by Matter of Thomas*, 729 F.2d 502 (7th Cir.1984)); *Oklahoma Brick Corp. v. Fisher (In re Fisher)*, 22 B.R. 896 (Bankr.D.Okla.1982) (residential building contractor was a fiduciary under Oklahoma lien trust statute for purposes of rendering debt nondischargeable); *Runnion v. Pedrazzini (In re Pedrazzini)*, 644 F.2d 756 (9th Cir. 1981) (California statute did not create true fiduciary relationship between swimming pool contractor and homeowner; *held,* that a statute can create an express trust but the focus should be on whether true fiduciary responsibilities are imposed or whether a constructive trust is created); *Angelle v. Reed (In the Matter of Angelle)*, 610 F.2d 1335 (5th Cir.1980) (home construction contractor was not a fiduciary because criminal statute did not create fiduciary relationship for purposes of former Bankruptcy Act dischargeability provision where at best a constructive trust was created at time of act); *Weber v. Evans*

consulted on the issue of whether fiduciary capacity exists, and then have deferred to State law precedents to decide the ultimate issue.[17]

*(In the Matter of Evans)*, 1 B.R. 229 (Bankr. S.D.Fla.1979) (New York judgment established that debtor was trustee under New York statutory lien law and was therefore estopped from denying that he had committed defalcation while acting as a fiduciary capacity); *Devaney v. Dloogoff (In the Matter of Dloogoff)*, 600 F.2d 166 (8th Cir.1979) (contractor was not fiduciary under Nebraska criminal statute); *In the Matter of Kawczynski*, 442 F.Supp. 413 (W.D.N.Y.1977) (New York Lien Law created fiduciary relationship within the meaning of section 17a(4) of the former Bankruptcy Act).

16. *Ramos v. Rivera (In re Rivera)*, 217 B.R. 379 (Bankr.D.Conn.1998); *Koenig v. Grotrian (In re Grotrian)*, 217 B.R. 1017 (Bankr. N.D.Ind.1997); *Lapin v. Glatstian (In re Glatstian)*, 215 B.R. 495 (Bankr.D.N.J.1997); *Airtron*, 213 B.R. at 665; *Tudor Oaks Ltd. Partnership v. Cochrane (In re Cochrane)*, 124 F.3d 978 (8th Cir.1997) *cert. denied*, 522 U.S. 1112, 118 S.Ct. 1044, 140 L.Ed.2d 109 (1998); *United Food & Commercial Worker's Union v. Eldridge (In Matter of Eldridge)*, 210 B.R. 188 (Bankr.N.D.Ala.1997); *Carlisle Cashway, Inc. v. Johnson (In re Johnson)*, 691 F.2d 249 (6th Cir.1982); *Angelle v. Reed (In the Matter of Angelle)*, 610 F.2d 1335 (5th Cir.1980).

17. *Schreibman v. Zanetti–Gierke (In re Zanetti–Gierke)*, 212 B.R. 375 (Bankr.D.Kan.1997) (a partner is not a fiduciary under Kansas and Missouri law for purposes of § 523(a)(4)); *Smith v. Young (In re Young)*, 208 B.R. 189 (Bankr.S.D.Cal.1997) (fiduciary capacity is a question of Federal law, but State law is considered for purpose of determining the existence of a trust); *Krishnamurthy v. Nimmagadda (In re Krishnamurthy)*, 209 B.R. 714 (9th Cir. BAP 1997) (whether a relationship is a fiduciary one within the meaning of § 523(a)(4) is a question of Federal law that can be resolved by looking to State law; under California law, a partner is a fiduciary); *Quaif v. Johnson*, 4 F.3d 950 (11th Cir.1993) (applying Georgia law, insurance agent was fiduciary for purposes of § 523(a)(4)); *Pan–Western Life Insurance Co. v. Galbreath (In re Galbreath)*, 112 B.R. 892 (Bankr.S.D.Ohio 1990) (a director of a corporation is a fiduciary under Ohio law); *Beebe v. Schwenn (In re Schwenn)*, 126 B.R. 351 (D.Colo.1991) (the court looked to Colorado common law to find that a joint venturer was a fiduciary); *Ragsdale v. Haller (In re Ragsdale)*, 780 F.2d 794

The problem with deferring to State law the decision of what constitutes fiduciary capacity is that State law considers practically every agent to be a fiduciary within the scope of his or her employment.[18] "A fiduciary relation arises whenever confi-

(9th Cir.1986) (although fiduciary capacity is to be narrowly defined as a matter of Federal law, State law is consulted "to determine when a trust in this strict sense exists;" in California, general partners are fiduciaries); *In the Matter of Thomas*, 729 F.2d 502 (7th Cir.1984) (subcontractors were fiduciaries under Wisconsin statute); *Super Concrete Corp. v. Shipe (In re Shipe)*, 41 B.R. 584 (Bankr. D.Md.1984) (Maryland law made assignor/assignee relationship fiduciary in nature for purposes of holding debt nondischargeable on basis of fiduciary fraud;) *Weber v. Evans (In the Matter of Evans)*, 1 B.R. 229 (Bankr. S.D.Fla.1979) (New York judgment established that debtor was trustee under New York statutory lien law and debtor was therefore estopped from denying that he had committed defalcation while acting as a fiduciary); *In the Matter of Kawczynski*, 442 F.Supp. 413 (W.D.N.Y.1977) (New York Lien Law created fiduciary relationship within the meaning of Section 17a(4) of the Bankruptcy Act, predecessor to Section 523(a)(4) of the Bankruptcy Code. Sometimes this is done because a another Federal court with binding authority has done so. *See, e.g., Irr Supply Centers, Inc. v. Phipps (In re Phipps)*, 217 B.R. 427 (Bankr.W.D.N.Y.1998) (because U.S. district court had so held, bankruptcy court was bound to hold nondischargeable debt of general contractor who failed to comply with New York Lien Law); *Airtron v. Faulkner (In re Faulkner)*, 213 B.R. 660, 665 n. 9 (Bankr. W.D.Tex.1997)(*held*, bankruptcy court was constrained to follow binding precedent of the Fifth Circuit Court of Appeals in "carv[ing] out a special exception from its general rule regarding trusts *ex maleficio* (which are generally not actionable under section 523(a)(4)) for trusts 'raised' by the conduct of contractors in misapplying funds subject to Texas' construction trust fund statute.").

*But see Tanneberger v. Paeplow (In re Paeplow)*, 217 B.R. 705 (Bankr.D.Vt.1998) (landlord-tenant relationship is not a fiduciary one when tenant sued for misappropriation of security deposit because state security deposit statute did not create express trust on behalf of tenants and a security deposit is held for the landlord's security); *Ramos v. Rivera (In re Rivera)*, 217 B.R. 379 (Bankr.D.Conn.1998) (under Federal law, mortgagor who sold real property was not trustee for mortgagee, and failure to turnover proceeds of sale was not defalcation, where no intent to defraud was proven); *Riden v. Sigler (In re Sigler)*, 196 B.R. 762 (Bankr.W.D.Ky.1996) (contractor was not fiduciary under state statute requiring payment of subcontractors and suppliers,

and statute did not create express trust); *Evans v. Pollard (In re Evans)*, 161 B.R. 474 (9th Cir. BAP 1993) (State court decision that gave broad scope to definition of fiduciary in holding that real estate broker was a fiduciary could not be given collateral estoppel effect in dischargeability action); *Martin v. Fidelity & Deposit Co. of Maryland (In re Martin)*, 161 B.R. 672 (9th Cir. BAP 1993) (State law is not conclusive on the issue of whether one is a fiduciary but merely instructive) (*overruled on other grounds, Lewis v. Scott (In re Lewis)*, 97 F.3d 1182 (9th Cir.1996)); *MacArthur Co. v. Crea (In re Crea)*, 31 B.R. 239 (Bankr.D.Minn. 1983) (criminal statute relating to theft by contractor did not give rise to nondischargeable debt, and because statute contained no requirement of scienter, constructive trust imposed by statute did not give rise to fiduciary duty); *Truax & Hovey, Ltd. v. Grosso (In re Grosso)*, 9 B.R. 815 (Bankr.N.D.N.Y.1981) (while New York Lien Law was held to create express trust, the debt was determined to be dischargeable because of lack of proof of diversion of trust assets).

Compare a wholly different proposition, espoused by the Supreme Court in a different bankruptcy context in the case of *Jaffke v. Dunham*, 352 U.S. 280, 77 S.Ct. 307, 1 L.Ed.2d 314 (1957), that whether the evidence established a constructive trust so as to exclude property from a bankrupt's estate under the former Bankruptcy Act was a question of State law. *See also Mid–Atlantic Supply, Inc. of Virginia v. Three Rivers Aluminum Co. (In re Mid–Atlantic Supply Co.)*, 790 F.2d 1121 (4th Cir.1986) (under Virginia law, subcontractor that filed Chapter 11 held check from contractor in constructive trust so as not to be part of bankruptcy estate).

**18.** "Agency is the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act." § 1, *Restatement (Second) of Agency* (1958). *See also Sim v. Edenborn*, 242 U.S. 131, 37 S.Ct. 36, 61 L.Ed. 199 (1916) (one who induced syndicate subscribers to become parties to an agreement creating him their agent to acquire and deal with certain properties, a position of special trust and confidence, was liable under New York law for breach of fiduciary duty); *Palmer v. Chamberlin*, 191 F.2d 532 (5th Cir. 1951) (officers and directors of a corporation are, in a sense, trustees; an agent is a fiduciary with respect to matters within scope of his agency); *Yahraus v. Continental Oil Co.*, 218 Ark. 872, 239 S.W.2d 594 (1951) (retail seller

dence is reposed on one side, and domination or influence result on the other; the relation can be legal, social, domestic, or merely personal." *In the Matter of the Estate of Heilman*, 37 Ill.App.3d 390, 395, 345 N.E.2d 536, 540 (1976) (citing *In re Estate of Jarmuth*, 329 Ill.App. 619, 70 N.E.2d 336 (1946)).

■ This Court holds that "[w]hile state law is important in determining when a trust relationship exists, the issue [of whether the debtor was acting in a fiduciary capacity] is ultimately a federal question." *Stahl v. Lang (In re Lang)*, 108 B.R. 586 (Bankr.N.D.Ohio 1989) (citing *In re Short*, 818 F.2d 693 and *In re Johnson*, 691 F.2d 249). *See for example, Fletcher*

*v. Safe Deposit & Trust Co.*, 193 Md. 400, 67 A.2d 386 (1949) (generally, the validity of a will of movables or of a trust of movables, is determined by the law of the testator's domicile); *Gray v. Harriet Lane Home for Invalid Children*, 192 Md. 251, 64 A.2d 102 (1949) (to create a trust, the legal estate must be separated from the beneficial enjoyment and a trust cannot exist where the same person possesses both); *Safe Deposit & Trust Co. Of Baltimore v. Robertson*, 192 Md. 653, 65 A.2d 292 (1949) (spendthrift trusts are valid in Maryland);

■ Even though the Bankruptcy Code does not define "fiduciary capacity," the term is to be narrowly construed in the context of dischargeability of debts in

and distributor of plaintiff's products was plaintiff's agent, a fiduciary with respect to the matters within the scope of his agency.; the very relation implies that the principal has reposed some trust or confidence in the agent); *Stainback v. West (In re Arbuckle's Estate)*, 98 Cal.App.2d 562, 220 P.2d 950 (1950) (where evidence showed that a particular party was testator's trusted agent and business manager, such relationship was a confidential one and fiduciary in character); *People v. Riggins*, 8 Ill.2d 78, 132 N.E.2d 519 (1956) (person who ran collection agency engaged by victim to make collections on victim's behalf, on commission basis, was an "agent" within statute imposing punishment for embezzlement upon any agent who receives money in his fiduciary capacity and converts it to his own use); *Cole v. Hartford Acc. & Indem. Co.*, 242 Iowa 416, 46 N.W.2d 811 (1951) (insurance agent was fiduciary to insurance company but not fiduciary to insured); *Wolcott & Lincoln, Inc. v. Butler*, 155 Kan. 105, 122 P.2d 720 (1942) (the relation of principal and agent is a fiduciary one; broker who purchased and sold grain for customer was an agent owing fiduciary to customer as principal); *Shatz Realty Co. v. King*, 225 Ky. 846, 10 S.W.2d 456 (1928) (real estate agent must act in compliance with the instructions of his principal, is bound to exercise reasonable skill and diligence in the transaction of the business which is intrusted to him, and will be responsible to the owner of the property for any loss resulting from his failure to exercise ordinary care in obtaining a tenant); *Burch v. Odell*, 54 N.D. 363, 209 N.W. 792 (1926) (bank to which paper was sent for collection was the agent of the payee, not the maker, to whom bank owed fiduciary duty);

*Miles v. Perpetual Sav. & Loan Co.*, 58 Ohio St.2d 93, 388 N.E.2d 1364, 12 O.O.3d 106, 58 Ohio St.2d 93, 388 N.E.2d 1364 (1979) (savings and loan association assumed role of plaintiffs' agent for purpose of securing a termite inspection of property for which plaintiffs obtained a purchase money mortgage, defendant was duty bound to disclose material facts relating to termite infestation before recording deed and distributing purchase money proceeds and, upon breach of that duty, was liable to plaintiffs for amount of compensatory damages sustained because one who acts as an agent for another becomes a fiduciary with respect to matters within scope of agency relationship); *Tatsuno v. Kasai*, 70 Utah 203, 259 P. 318 (1927) (relation between a stockbroker and client held that to be a fiduciary relation, one not only as generally exists between a mere principal and agent, but that of a trustee and *cestui que trust*); and *Westerbeck v. Cannon*, 5 Wash.2d 106, 104 P.2d 918 (1940) (one stands in a fiduciary relation to another when the latter has rights and duties which he or she is bound to exercise for the benefit of the other, and such person is not allowed to derive any profit or advantage from the relation except upon proof of full knowledge and consent of the other; fiduciary relation existed between realty broker, as agent, and plaintiffs who listed property with broker and subsequently signed contract for exchange of property, deed, and escrow agreement, so that failure of broker to inform plaintiffs that broker had an option to purchase the property plaintiffs were to receive and that broker would also acquire other property by the transaction and profit thereby warranted cancellation of the contract and deed on ground of fraud).

bankruptcy. *Davis v. Aetna Acceptance Co.,* 293 U.S. 328, 55 S.Ct. 151, 79 L.Ed. 393 (1934); *Fowler Bros. v. Young (In re Young),* 91 F.3d 1367 (10th Cir.1996); *Windsor v. Librandi (In re Librandi),* 183 B.R. 379 (M.D.Pa.1995); *First Options of Chicago, Inc. v. Kaplan (In re Kaplan),* 162 B.R. 684 (Bankr.E.D.Pa.1993), *aff'd,* 189 B.R. 882 (E.D.Pa.1995); *Orem Postal Credit Union v. Twitchell (In re Twitchell),* 91 B.R. .961 (D.Utah 1988), *rev'd,* 892 F.2d 86 (10th Cir.1989).

In the case of *Borg–Warner Acceptance Corp. v. Miles (In re Miles),* 5 B.R. 458 (Bankr.E.D.Va.1980), the court (Bonney, J.) stated:

> The term "fiduciary" has been consistently construed as limited to express trusts and not to trusts imposed because of an act of wrongdoing out of which the debt arose, or to trusts implied by law from contracts. The Courts have attempted to avoid making the exception so broad that it reaches such ordinary commercial relationships as creditor-debtor and principal-agent.

5 B.R. at 460 (citations omitted).

Since 1844, it has been held that only an express or technical trust can create a fiduciary capacity for purposes of nondischargeability of debt by a fiduciary in bankruptcy. In that year, the Supreme Court decided the case of *Chapman v. Forsyth,* 43 U.S. (2 How.) 202, 11 L.Ed. 236 (1844), which held that a factor was not a fiduciary for purposes of the nondischargeability of debt exception in the Bankruptcy Act of 1841 for defalcation by a fiduciary. The Court in *Chapman* warned that to expand the definition of "fiduciary capacity" to include factors and others whom the law implies hold fiduciary obligations would eviscerate the bankruptcy discharge:

> If the act embrace such a debt, it will be difficult to limit its application. It must include all debts arising from agencies; and indeed all cases where the law implies an obligation from the trust reposed in the debtor. Such a construc-

tion would have left but few debts on which the law could operate. In almost all the commercial transactions of the country, confidence is reposed in the punctuality and integrity of the debtor, and a violation of these is, in a commercial sense, a disregard of a trust. But this is not the relation spoken of in the first section of the act [of 1841].

43 U.S. at 208, 2 How. 202. *See also Neal v. Clark,* 95 U.S. (5 Otto) 704, 24 L.Ed. 586 (1877) (actual fraud rather than constructive fraud was required to except from discharge a debt created by debtor's *bona fide* purchase of bonds improperly sold by executor of decedent's estate); *Hennequin v. Clews,* 111 U.S. 676, 4 S.Ct. 576, 28 L.Ed. 565 (1884) (a lender holding collateral as security for his own debt is not a fiduciary); *Upshur v. Briscoe,* 138 U.S. 365, 11 S.Ct. 313, 34 L.Ed. 931 (1891) (an instrument by which $10,000 was transferred to a debtor "in trust" and which obligated him to make an annual payment of 7% to a third party created a debtor-creditor relationship only, and the use of the word "trust" was not determinative; as used in the statute, "fraud" means fraud in fact, or positive fraud, involving moral turpitude or intentional wrong); *Davis v. Aetna Acceptance Co.,* 293 U.S. 328, 55 S.Ct. 151, 79 L.Ed. 393 (1934) (an automobile dealer who sold "out of trust" vehicles by which lender was secured did not commit breach of trust).

Only fiduciaries in fact who are similar to those enumerated in *Chapman v. Forsyth* will meet the test. In that case, they were public officers, executors, administrators, guardians and trustees. As the Supreme Court held in *Chapman,* "and the 'other fiduciary capacity' mentioned, must mean the same class of trusts. The act speaks of technical trusts, and not those which the law implies from the contract. A factor is not, therefore, within the act." 43 U.S. at 208, 2 How. 202.

If a factor, who was actually entrusted with property for the benefit of another

was not acting in a fiduciary capacity under the *Chapman* doctrine, is one acting in a fiduciary capacity who enters into a contract with buyers and receives money outright to build a house? The question is susceptible to only one answer: **No.** It would seem obvious that the relationship between a homebuilder and homebuyer is not analogous to those of attorney and client, guardian and ward, trustee and beneficiary, or public officer and constituent. The latter are fiduciaries in fact while the former is not. There is no evidence in this case that the funds paid by Mr. and Mrs. Spinoso to Mr. Heilman were entrusted by them to him.

Many opinions, in effect, have permitted State courts and legislatures to overrule *Chapman v. Forsyth* and restrict the class of debtors to whom a bankruptcy discharge is available by deferring to the State law of fiduciaries. This was the criticism leveled by the late Judge James Yacos in the case of *BAMCO 18 v. Reeves (In re Reeves)*, 124 B.R. 5 (Bankr.D.N.H. 1990), when he opined:

> I realize that many lower court decisions [after] the *Davis* decision have in effect ignored the Supreme Court's teaching regarding technical and express trusts. Currently, a majority of the decisions simply look to state law to see if some fiduciary obligation in a generalized sense has been created. Once that is established, these courts essentially assume the federal definition is the same. *See, e.g., Ragsdale v. Haller (In re Ragsdale)*, 780 F.2d 794, 796–97 (9th Cir.1986) ("California has made all partners trustees over the assets of the partnership. Accordingly, we hold that California partners are fiduciaries within the meaning of § 523(a)(4)"); *See also In re Short*, 818 F.2d 693 (9th Cir.1987) (Washington law); *In re Mailath*, 108 B.R. 290 (Bankr.N.D.Okla.1989); *In re Blatnik*, 101 B.R. 718 (Bankr.E.D.Okla.

1989); *In re Selenske*, 103 B.R. 200 (Bankr.E.D.Wis.1989); *In re Guy*, 101 B.R. 961 (Bankr.N.D.Ind.1988); *In re Crosswhite*, 91 B.R. 156 (Bankr.M.D.Fla. 1988) (North Carolina law); *In re Dino*, 82 B.R. 184 (Bankr.D.R.I.1988); *In re Owens*, 54 B.R. 162 (Bankr.D.S.C.1984); *In re Kraus*, 37 B.R. 126 (Bankr. E.D.Mich.1984).

> [Footnote 1. It should be noted that other courts have looked to state law and found state law did not create a fiduciary duty among partners that would implicate § 523(a)(4). *See In re Weiner*, 95 B.R. 204 (Bankr.D.Kan. 1989); *In re Napoli*, 82 B.R. 378 (Bankr. E.D.Pa.1988) (New Jersey law); *In re Ryan*, 90 B.R. 554 (Bankr.S.D.Fla.1988); *In re Hurbace*, 61 B.R. 563 (Bankr. W.D.Tex.1986).]

> This approach in my judgment does not give proper attention to the narrowness of the federal definition of fiduciary. [Footnote omitted.] The federal law is aimed only at the express trust situation in which the debtor either expressly signified his intention at the outset of the transaction, or was clearly put on notice by some document in existence at the outset, that he was undertaking the special responsibilities of a trustee to account for his actions over and above the normal obligations that contracting parties have to each other in a commercial transaction. The concept of "incorporation by reference" of various state law duties labeled as fiduciary obligations does not serve to further the purpose encompassed by § 523(a)(4) of the Bankruptcy Code.

124 B.R. at 10.

Many courts make the unwarranted leap that such express or technical trusts can be created solely by statute, a doctrine that is inherently at odds with the holding in *Chapman*.[19] These cases invariably

---

**19.** Some courts have finessed the issue by holding that a trust was *imposed* by law rather than *implied* by law. *M–R Sullivan Mfg.*

*Co. v. Sullivan (In re Sullivan)*, 217 B.R. 670 (Bankr.D.Mass.1998) (a technical trust is one imposed by law and may be created by state

hold that such an express trust has been created if a statute merely provides that a trust exists in advance of a default, identifies a *res* and provides that it be held in trust by one party for the benefit of another. This is not a correct statement of the law.

 The lacking element is the intention of the parties as evidenced by an "explicit declaration of trust." *Harasymiw v. Selfreliance Federal Credit Union*, 97 B.R. 924 (N.D.Ill.1989), aff'd, 895 F.2d 1170 (7th Cir.1990). " 'Express trusts are those which are created by the direct and positive acts of the parties, by some writing, or deed, or will, or by words either expressly or impliedly evincing an intention to create a trust.' " *Wertin v. Wertin*, 217 Minn. 51, 54, 13 N.W.2d 749, 751 (1944) (*quoting* 65 C.J., Trusts, pp. 220, 221, [§ 10]B). Whether an express trust has been created is a question of intention. *Kozlowska v. Napierkowski*, 165 Md. 620, 170 A. 193 (1934); *Foschia v. Foschia*, 158 Md. 69, 148 A. 121 (1930).

"Express" trusts, which are sometimes referred to as "direct," "technical," or "voluntary" trusts, are those trusts intentionally created by the direct and positive act of the settlor, by some writing, deed, or will, or oral declaration. Express trusts are distinguishable from trusts by operation of law, resulting and constructive, in that the latter are respectively founded upon an intention of the parties to a transaction implied in law, or upon fraud or wrong, irrespective of the parties concerned. Furthermore, an express trust involves the separation of the legal and beneficial interests in a thing or "res," as it is called, whereby the legal interests are held by a person, the trustee, for the benefit of another, the beneficiary, who has an equitable interest in the res to

receive whatever benefits he is entitled to therefrom by the terms of the trust.

Express or technical trusts are formed by an agreement between the parties to impose a trust relationship. An express or technical trust is a formal fiduciary relationship whose creation is based upon the intentions of a settlor or a beneficiary. In some instances, a formal trust document is executed which establishes the rights and duties of the parties to the trust. Anyone competent to contract may make such disposition of the legal title to his property as he pleases, may annex such conditions and limitations to its enjoyment as he chooses, and may vest it in trustees for the purpose of carrying out his intention. Nevertheless, the creation and validity of an express or direct trust depends upon its compliance with substantial and formal essentials and requisites.

§ 20, *Trusts*, 76 Am.Jur.2d 50–51 (1992) (citations omitted).

 In Maryland, an express trust is created only if an intent to create a trust is manifested by a settlor. *Nat. Union Mortg. Corp. v. Potomac Consol. Debenture Corp.*, 178 Md. 658, 16 A.2d 866 (1940); *Colmary v. Fanning*, 124 Md. 548, 92 A. 1045 (1915); *Colburn v. Union Prot. Inf. of Baltimore City*, 114 Md. 94, 78 A. 817 (1910). Trusts are either express or arise by operation of law. *Springer v. Springer*, 144 Md. 465, 125 A. 162 (1924).

 Only the parties themselves can create a fiduciary relationship in fact. A statute may recognize that relationship and impose additional burdens upon it, including criminal liability for its abuse. A statute may even purport to convert a breach of contract into a breach of a trust *ex maleficio*, but these are in the nature of

statute or common law); *Beebe v. Schwenn (In re Schwenn)*, 126 B.R. 351 (D.Colo.1991) (joint venturer was a fiduciary under Colorado common law and statutory law; the debt was nondischargeable because the trust was one imposed by law rather than implied by

law). Where the debtor must be a fiduciary in fact for the debt to be nondischargeable, this would seem to be a distinction without a difference because trusts implied in law and imposed in law both arise *by operation of law*.

constructive or resulting trusts, arising by operation of law, and therefore distinguishable from express or technical trusts for purposes of nondischargeability of debt in bankruptcy.

Trusts are sometimes generally classified as express trusts and trusts which arise by operation of law. Trusts by operation of law are sometimes referred to as "indirect," "involuntary," or "implied" trusts. It has been said that an implied trust is created by implication of law based upon the presumed intention of the parties or based upon equitable principles independent of the particular intention of the parties.

However generally described, such trusts are further classified into resulting trusts and constructive trusts.

Another type of trust created by law is a "statutory trust;" a statutory trust is a legislative creation and is therefore not an express trust in the absence of an intention by the parties to create a fiduciary agreement between themselves. That is, a statutory trust cannot be a technical trust—as express trusts are sometimes referred to—in the absence of the execution of a formal trust agreement between the parties.

§ 159, *Trusts,* 76 Am.Jur.2d 191 (1992) (citations omitted).

 Statutory trusts are not express or technical trusts. Trusts created by statute are quasi-trusts, constructive trusts and/or resulting trusts, because they are created in law, regardless of the intentions of the parties. A statute alone cannot, in the absence of the parties' expressed intention, create an express or technical trust. A State statute cannot convert a purely commercial debtor-creditor relationship into something more for purposes of denying a debtor a discharge of the debt. The State legislature is free to criminalize certain conduct, provide civil penalties for it, even call such misconduct the violation of a trust for purposes of enhancing the State law remedies of a particular class, for example, consumers,

subcontractors or homebuyers. But it cannot expand the meaning of fiduciary capacity under the Bankruptcy Code to alter the intent of Congress as divined by Federal case law. To permit the States to accomplish this would be to permit them to overrule *Chapman* and its progeny. Could State legislatures effectively nullify the Supreme Court's decision in *Chapman v. Forsyth* by enacting laws decreeing that henceforth factors would be fiduciaries holding property consigned to them in trust? This Court thinks not. There must be something in addition to a statute that elevates one to the status as a fiduciary in fact. The nomenclature employed by the statute itself may not even be determinative of the issue. Courts that have held that fiduciary relationships existed solely by statutory creation regardless of the parties' actual intent for the purpose of excepting the debt from a bankruptcy discharge commit the ultimate error of not considering the actual nature of the relationship created. "[N]ot all relationships defined under state law as 'fiduciary' are necessarily the sorts of relationships for which a nondischargeability action will stand under federal bankruptcy law. In general, the courts require that a 'true' or 'express' trust must be raised, as opposed to a trust *ex maleficio* (i.e., one which arises only as a result of the conduct which gave rise to the debt.)." *Airtron,* 213 B.R. at 664 (Bankr.W.D.Tex.1997) (citations omitted).

In addressing the ultimate question of whether one was a fiduciary in fact, the Court must answer the following questions in this case:

**1. Was the debtor a fiduciary in fact according to State law, either by statute or court decision?**

No. In the case of *Schwartz v. State,* 103 Md.App. 378, 653 A.2d 958 (1995), the Maryland Court of Special Appeals held that the Maryland Custom Home Protection Act did not convert a home builder's employee into a fiduciary for purposes of imposing criminal liability under a sepa-

rate statute pursuant to which the debtor was charged with defalcation by a fiduciary.[20]

Maryland statutory law of Fiduciaries is also instructive. Title 15 of the Estates and Trusts Article of the Maryland Annotated Code contained the following definition of "fiduciary" which was in effect at the time the events transpired in the instant case:

> "Fiduciary" includes a trustee acting under a deed, will, declaration of trust or other instrument in the nature of a trust or appointed by a court, a receiver, custodian, committee or guardian of the property of a minor or disabled person,

executor, administrator, or personal representative.

Md. Estates & Trusts Code Ann., § 15–101(e) (1991).

**2. Was the debtor the trustee of an express or technical trust in favor of the plaintiffs?**

 No. An express or technical trust, also known as a direct or voluntary trust, requires for its creation the intention of the parties manifested by unequivocal words, a lawful and identifiable *res*, or subject matter, and a lawful purpose.[21] The parties' intention to create an express trust may be by written or unwritten declaration, depending upon its subject mat-

20. The court's analysis is instructive:

> We agree with appellant that she is not a fiduciary as contemplated within the meaning of [Md.Code Ann., art. 27 (1957)] § 132, and therefore, that her conviction under the section must be reversed. A person acts in a fiduciary capacity when the money he or she handles "is not his [or her] own and not for his [or her] own benefit." The monies appellant received from the Romans and the Blakes were received pursuant to the terms of their custom home contracts, in which Adams Homes agreed "to furnish labor and material in connection with construction, erection, or completion of a custom home." [Md. Real Prop.Code Ann.] § 10–501(e). The contracts identify Adams Homes as the "seller" and the Romans and the Blakes as the "buyers." Specifically, the "New Home Sales Contract" executed between Adams Homes and the Romans stated that "[i]n consideration of the mutual covenants and promises hereinafter set forth, Seller agrees to sell and the Buyer agrees to purchase upon the terms and conditions set forth in this Contract." The draw schedules incorporated into both contracts dictated the terms of payments and "set[ ] forth with particularity the sum to which the custom home builder shall be entitled to progress payment on the custom home contract after certain specified items of work have been completed on the custom home." *Id.* § 10–501(g) Therefore, Adams Homes was entitled to receive the progress payments after certain specified items of work had been completed on the homes.
>
> Any failure by Adams Homes to complete the specified items of work pursuant to a home buyer's custom home contract logically results in an action for breach of contract, and perhaps, a violation of the MCHPA. The

nature of both the Romans' and the Blakes' dissatisfaction with appellant is that she failed to perform specific items of work under their custom home contracts.

\* \* \* \* \*

> In light of the MCHPA's regulatory purpose, we hold that the Legislature intended the penalty provided in § 10–507 to be exclusive. Therefore, even if we were to hold that appellant is a "fiduciary" within the contemplation of § 132, general principles of law dictate that, because the Legislature enacted the special remedy set forth in § 10–507 and intended it to be exclusive, the State must punish appellant under § 10–507 for her violations of the MCHPA.
>
> As we stated supra, to convict someone under § 132, the State must prove a specific intent of fraud and willfulness.

103 Md.App. at 387–90, 653 A.2d at 962–64.

21. *Dougherty v. Dougherty,* 175 Md. 441, 2 A.2d 433 (1938) (in order to create a valid trust, there must be a definite subject matter within the disposition of the settlor, a lawful, definite object to which subject matter is to be devoted and clear and unequivocal words or acts devoting the subject matter to the object of the trust); *Sieling v. Sieling,* 151 Md. 536, 135 A. 376 (1926) (same); *Isaacs v. Emory,* 64 Md. 333, (1 A. 713) (1885) (in Maryland a trust cannot be upheld unless the beneficiaries are defined and capable of enforcing its execution in a court of equity); *Reiff v. Horst,* 52 Md. 255 (1879) (to be upheld in Maryland, a parol declaration of trust in personality delivered must be clear and explicit and must particularly identify the subject matter and beneficiary of the trust); *Smith v. Darby,* 39 Md. 268 (1874) (a parol declaration of trust is sufficient to create an express trust).

ter, and according to the law of the State.[22] There was no such intention present in the instant case.

### 3 Did the parties execute an explicit declaration of trust?

No. Neither the contracts nor the indemnity mortgage executed in this case qualified as a declaration of trust in favor of the plaintiffs.

### 4. Was an ordinary commercial relationship involved?

Yes. The relationship between a custom homebuilder and a custom homebuyer is an ordinary commercial relationship, even if one denominates the buyer as a consumer. There is no express or technical trust involved. The homebuyers and homebuilder were on an equal footing in this case. Natural sympathy for the disillusioned homebuyers adds nothing to the equation.

### 5. Were there technical duties to be performed by the so-called trustee other than the mere payment or segregation of money?

No. The homebuilder had *no technical duties* to perform as a fiduciary other than the mere payment or segregation of money.

### 6. Was the relationship between the parties under the statute a trust by operation of law?

Yes. The statute at best created a constructive or resulting trust, because it did not actually arise until Mr. Heilman failed to perform, and was therefore one implied in law. In order to be nondischargeable, the liability for the debt had to come into existence *after* the debtor occupied a fiduciary capacity toward the plaintiffs.

The Supreme Court so held in the case of *Upshur v. Briscoe*, 138 U.S. 365, 11 S.Ct. 313, 34 L.Ed. 931 (1891), when it cited with approval the case of *Cronan v. Cotting*, 104 Mass. 245 (1870), and quoted from that opinion the following statement that is equally applicable here:

" . . . The debt, in this case, arose exclusively out of a single transaction between the parties. Its creation involved no element other than that of contract. The existence of the liability did not spring from any breach of trust. The only default consisted in the non-payment of the balance due to the plaintiff,

---

**22.** *See Old Republic National Title Ins. Co. v. Tyler (In re Dameron)*, 155 F.3d 718 (4th Cir. 1998) (under Virginia law, an express trust is created when parties affirmatively manifest an intention that certain property be held in trust for benefit of a third party); *U.S. v. Santoro*, 866 F.2d 1538 (4th Cir.1989) (under North Carolina law, an express trust can be created even though the declaration of trust is contained in an instrument other than a deed). In Maryland, the statute of frauds applies to an agreement to hold real estate in trust and requires a writing signed by the party sought to be held to the agreement. *Villarreal v. Glacken*, 63 Md.App. 114, 492 A.2d 328 (1985); *Juliano v. Juliano*, 36 Md. App. 1, 372 A.2d 1084 (1977); *Grimes v. Grimes*, 184 Md. 59, 40 A.2d 58 (1944); *O'Connor v. Estevez*, 182 Md. 541, 35 A.2d 148 (1943) (an express trust need not be in writing, but as to realty, it must be evidenced by some writing and signed by the party enabled by law to declare such trust); *Keller v. Kunkel*, 46 Md. 565 (1877) (a parol declaration of trust cannot establish an express trust in land). *But see Dove v. White*, 211 Md. 228, 126 A.2d 835 (1956) (alternative means of proving express trust in land created by parol). Under Virginia law, an express trust in real property created by parol agreement is enforceable. *Stone v. Stone*, 460 F.2d 64 (4th Cir.1972); *Sterling v. Blackwelder*, 383 F.2d 282 (4th Cir.1967).

In Maryland, express trusts in personalty may be created and proven by parol evidence. *Shaffer v. Lohr*, 264 Md. 397, 287 A.2d 42 (1972) (express trust in joint bank account even though bank records and entries were not in trust form, if expression of clear and unmistakable intent to create a trust can be found from the facts); *Urquhart v. Alexander & Alexander, Inc.*, 218 Md. 405, 147 A.2d 213 (1958) (parol evidence may be sufficient to prove the intention of an insured to create a trust of proceeds from an insurance policy if evidence is clear and convincing); *Mushaw v. Mushaw*, 183 Md. 511, 39 A.2d 465 (1944); *Sturgis v. Citizens' Nat. Bank of Pocomoke City*, 152 Md. 654, 137 A. 378 (1927) (trust of personalty may be created and proved by parol).

after satisfying the purpose of the pledge. The debt did not result from, but preceded, that default." In the present case, the debt of Briscoe preceded his default, and was not created by his failure to carry out the provisions of the mandate. It is to be noted that the language of section 33 of the act of 1867 excepts debts created by the bankrupt "while acting in any fiduciary character," and the language would seem to apply only to a debt created by a person who was already a fiduciary when the debt was created. In this view, it was said in *Cronan v. Cotting, supra:* "We are inclined to the opinion that the phrase implies a fiduciary relation existing previously to, or independently of, the particular transaction from which the debt arises."

138 U.S. at 378, 11 S.Ct. at 317–18.

A key indication that a statute does not create a fiduciary in fact, but rather one implied in law, is the typical provision turning reality on its ear by providing for presumptions of wrongdoing in the absence of factual evidence to that effect. At the time the events in the instant case transpired, the Maryland Custom Home Protection Act contained such a presumption in Section 10–503.

**7. Did the statute give the beneficiary a cause of action against the alleged fiduciary for breach of trust?**

The Maryland Custom Home Protection Act renders violators liable for breach of trust as an unfair or deceptive trade practice under Title 13 of the Maryland Commercial Code and provides that any breach of trust is a misdemeanor, subjecting violators to criminal prosecution, with penalties including restitution, a fine of not more than $1.000 and/or imprisonment for not more than one year. § 10–507. The plaintiffs took no prepetition or postpetition action under the statute. The plaintiffs never filed criminal charges against the debtor, although they were not precluded from so doing by the automatic stay after the debtors filed bankruptcy. *Widdowson*

*v. Taylor,* 44 B.R. 548 (D.Md.1984). Assuming that homebuyers could prove their allegations, the criminal statute would give them a complete remedy. The fact that the statute imposed a criminal penalty reinforces the premise that the statute created a trust *ex maleficio.*

In the case of *In re Marchiando,* 13 F.3d 1111 (7th Cir.1994), *cert. denied sub nom. Illinois Dept. of the Lottery v. Marchiando,* 512 U.S. 1205, 114 S.Ct. 2675, 129 L.Ed.2d 810 (1994), the Seventh Circuit, speaking through Chief Judge Posner, held that a lottery sales agent was not a fiduciary to the State of Illinois, despite a trust statute that imposed nominal duties upon her. The trust language employed in the statute was held not to be determinative of the issue of fiduciary capacity. The court looked instead to the facts in the case to reach its legal conclusion that a fiduciary capacity was not present:

If we probe more deeply the distinction between the fiduciary relation that imposes real duties in advance of the breach and the fiduciary relation that does not we find that the first group of cases involve a difference in knowledge or power between fiduciary and principal which, as we put it in *Maksym v. Loesch, supra,* 937 F.2d 1237, 1242, gives the former a position of ascendancy over the latter. *See also Kham & Nate's Shoes No. 2, Inc. v. First Bank,* 908 F.2d 1351, 1357 (7th Cir.1990), *Weinberger v. Kendrick,* 698 F.2d 61, 78–79 (2d Cir.1982) (Friendly, J.); *Gratz v. Claughton,* 187 F.2d 46, 49 (2d Cir. 1951) (L.Hand, J.). The fiduciary may know much more by reason of professional status, or the relation may be one that requires the principal to repose a special confidence in the fiduciary; both factors are present in the case of a lawyer-client relation and also the relation between director and shareholder of managing partner and limited partner. Or the principal may be a child, lacking not only knowledge but also the power to act upon it. These are all situations

in which one party to the relation is incapable of monitoring the other's performance of his undertaking, and therefore the law does not treat the relation as a relation at arm's length between equals.

*Marchiando,* 13 F.3d at 1116. *But see Holaday v. Seay (In re Seay),* 215 B.R. 780 (10th Cir. BAP 1997) ("Neither a general fiduciary duty of confidence, trust, loyalty, and good faith, nor an inequality between the parties' knowledge and bargaining power, is sufficient to establish a fiduciary relationship for purposes of dischargeability.") *Id.* at 786 (*quoting Fowler Bros. v. Young (In re Young),* 91 F.3d 1367, 1372 (10th Cir.1996)).

This Court agrees with the result reached in *Marchiando,* and with the opinion's holding that State statutory law is not determinative of the issue of fiduciary capacity. However, this Court does not agree with the reasoning in the court's determination that a fiduciary relationship did not exist on the ground that there was no ascendant position of the alleged fiduciary over the State of Illinois. The *Marchiando* court's analysis is similar to that employed in order to imply the existence of a constructive or resulting trust. The court even states, at one point, "The inequality of relation that calls for the *imposition* of fiduciary duties is wholly absent." 13 F.3d at 1116 (emphasis supplied). In the cases of express or technical trusts, fiduciary duties are *accepted* by the fiduciary in the factual sense, and not *imposed* in the legal sense. The reason that *Marchiando* is incorrect on this point is that the doctrine of *Chapman v. Forsyth* does not permit reliance on the superiority in power and knowledge of the agent over

the principal as a basis for finding the existence of a fiduciary capacity.[23] The true distinction of *Chapman* is that an express or technical trust, or its equivalent, is required, which can never be created by statute alone absent the parties' own intent. In other words, Ms. Marchiando was a fiduciary in law, because the statute made her one. She was, as the court correctly found, a trustee *ex maleficio* under the statute, but was not a fiduciary in fact for purposes of denying the dischargeability of her debt to the State of Illinois under the Bankruptcy Code. The result in *Marchiando* is correct in light of *Chapman,* but for the wrong reason. In *Chapman,* the Supreme Court never inquired into Mr. Forysth's superiority in power and knowledge over Mr. Chapman. Even in the absence of such a formal inquiry, it would appear from the nature of the relation of factor to consignor that the factor was the ascendant party. Unfortunately for Mr. Chapman, that was not the test of whether his debt was excepted from Mr. Forsyth's bankruptcy discharge. While there is obviously a great degree of trust and confidence reposed in the relationship between factors and their principals, a factor is not a fiduciary in the formal sense of the word for the purpose of determining the dischargeability of debt in a bankruptcy case. *See also Upshur v. Briscoe,* 138 U.S. at 375, 11 S.Ct. at 317 (a debt is not created by a person while acting in a "fiduciary character" merely because it is created under circumstances in which trust or confidence is reposed in the debtor).

However, this Court wholeheartedly endorses the views espoused by the Seventh Circuit in *Marchiando* in holding that the

---

**23.** *See Cole v. Hartford Acc. & Indem. Co.,* 242 Iowa 416, 427–28, 46 N.W.2d 811, 817 (1951), where the court stated:

> Plaintiff argues that wherever one party to a business transaction has superior knowledge of the facts involved therein a fiduciary relation exists and that [the defendant] had such knowledge. While of course there may be a fiduciary relation even though there is no relation of trustee and cestui, guardian and ward, attorney and client or the like, we think the authorities do not go to the extent plaintiff contends. The logical result of this argument would be there is a fiduciary relation between both parties to most transactions since it is seldom one does not have knowledge of the facts superior to the other.
>
> *Id.*

Illinois statute in question actually created a trust *ex maleficio,* and the court's echo of the warning first given by the Supreme Court in *Chapman:*

> The key to knitting the cases into a harmonious whole is the distinction stressed in *Davis [v. Aetna Acceptance Co.,* 293 U.S. 328, 55 S.Ct. 151, 79 L.Ed. 393 (1934)] and other cases between a trust or other fiduciary relation that has an existence independent of the debtor's wrong and a trust or other fiduciary relation that has no existence before the wrong is committed. A lawyer's fiduciary duty is to his client, or a director's duty to his corporation's shareholders, pre-exists any breach of that duty, while in the case of a constructive or resulting trust there is no fiduciary duty until a wrong is committed. The intermediate case, but closer we think to the constructive or resulting trust pole, is that of a trust that has a purely nominal existence until the wrong is committed. Technically, Marchiando became a trustee as soon as she received her license to sell lottery tickets. Realistically, the trust did not begin until she failed to remit ticket receipts. For until then she had no duties of a fiduciary character toward the Department of Lottery or anything or anyone else. Until then, she was just a ticket agent. The state, afraid that she might be a disloyal agent, required her to keep the proceeds of her ticket sales separate from her other funds and threatened her with criminal punishment if she did not. These were devices by which the state sought to establish and enforce a lien in the proceeds, the better to collect them securely. The analogy is to "floor planning," where a bank insists that the proceeds from any sale of inventory be remitted to the bank to pay down the principal of the loan as soon as the sale is made. Such arrangements, held not to come within the scope of section 523(a)(4) in *Davis* and *[In re] Long,* 774 F.2d 875 (8th Cir.1985), are remote from the conventional trust or fiduciary setting, in which someone—a lawyer for example, or a guardian, or a managing partner—in whom confidence is reposed is entrusted with another person's money for safekeeping. *See also In re Iowa R.R.,* 840 F.2d 535, 541–45 (7th Cir. 1988).

$$* \quad * \quad * \quad * \quad *$$

> If, contrary to our decision in *Judd v. First Federal Savings & Loan Ass'n,* 710 F.2d 1237 (7th Cir.1983), which holds that the word "trust" in an instrument does not by itself "transform a traditional debtor-creditor relationship into a fiduciary relationship," a fiduciary is anyone whom a state calls a fiduciary—the only principle on which the discharge of Marchiando's debt could be refused—states will have it in their power to deny a fresh start to their debtors by declaring all contractual relations fiduciary. They are not apt to go that far. They are apt to seek a preferred position for their own debts by declaring people who do business with the state fiduciaries of the state or its agencies. Illinois tried to do this with its ticket agents. If it succeeds, next it could do it with all its other contractors. Libertarians may smile approvingly at the state's equating its bureaucracies to the children and other incompetents who are the classic trust beneficiaries, but we do not think Congress would. The convenience-store keeper who commingles the proceeds of lottery ticket sales with her other receipts is at a considerable remove from the lawyer who converts money in his clients' escrow accounts or the bank trust department that invests someone's retirement fund recklessly.

*Marchiando,* 13 F.3d at 1116–17.

### FOURTH CIRCUIT PRECEDENT

In the case of *Hamby v. St. Paul Mercury Indemnity Co.,* 217 F.2d 78 (4th Cir. 1954), in which it was held that a real estate agent was a fiduciary for purposes of finding a debt nondischargeable that

arose from the agent's failure to pay money, the Fourth Circuit seemed to equate real estate agents with attorneys at law:

> .. [T]he case here is not like that of a factor or broker, such as was involved in *Chapman v. Forsyth*, 2 How. 202, 11 L.Ed. 236, where it was intended that a mere debtor-creditor relationship be created with respect to the proceeds of property sold. Not all agents act in a fiduciary capacity; but certainly, an agent is acting in such capacity when he is handling funds which have been entrusted to him to be applied to a specific purpose. The case of a real estate agent who misappropriates such funds cannot be distinguished from that of an attorney at law who is guilty of such misappropriation.

217 F.2d at 80. In *Pahlavi v. Ansari (In re Ansari)*, 113 F.3d 17 (4th Cir.1997), the Fourth Circuit held that a financial advisor who had been found to be a fiduciary by default in a State court judgment and to have committed fraud was barred by collateral estoppel from contesting those findings in the bankruptcy court. A custom homebuilder is not analogous to either a real estate broker or a financial advisor. In the instant case, there is no binding State court judgment.

The plaintiffs have cited the unreported Fourth Circuit decision in the case of *Pleasants v. Black (In re Black)*, 914 F.2d 1490, 1990 WL 139354 (4th Cir.1990), as precedent for their position that the instant complaint was sustainable. The Court notes that unreported opinions are not binding authority in this circuit. *See* Fourth Circuit Local Rule 36(c).[24]

How does this Court reconcile its opinion with that of District Judge Alexander Williams in the case of *N.P. Deoudes, Inc. v. Snyder (In re Snyder)*, 184 B.R. 473 (D.Md.1995) (the Perishable Agricultural Commodities Act gave rise to a requisite fiduciary relationship sufficient to deny dischargeability of debt to one who violated its terms). The answer is simply that *N.P. Deoudes* does not appear to have considered the opinions of the Supreme Court in *Chapman v. Forsyth, supra,* or *Davis v. Aetna Acceptance Co., supra.*[25]

---

**24.** There are significant differences between *Pleasants v. Black* and the case at bar. In the instant case, the Spinosos invited the builder to construct a house for them without conducting any background investigation. Mr. Heilman informed the Spinosos that the deposits they had paid to him had all been spent before construction, but they continued to deal with him anyway. The parties agreed that Mr. Heilman would receive a series of additional payments over a period of time upon completion of various stages of construction of the house. Mr. Heilman built a house that was nearly complete. He stayed on the premises and continued to work on the house; did not abscond with the money or abandon the job. At the Spinosos' request, Mr. and Mrs. Heilman put an indemnity deed of trust on their own house as a good faith gesture that ultimately proved fruitless, and their home was later sold at foreclosure. The Heilmans filed a Chapter 13 proceeding to repay their creditors, including the Spinosos, which proved unsuccessful, and the case was converted to a Chapter 7 liquidation proceeding.

In *Pleasants*, the buyers were pleased with work the builder had performed for them in the past and hired him to build them a house. Because the buyers were unsure of the builder's financial condition, the builder assured them "that he had a house, insurance and bond that would protect them." In the instant case, at the buyers' request, the Heilmans actually mortgaged their home to the Spinosos but also disclosed that the house was encumbered by a first mortgage. The district court in *Pleasants v. Black* emphasized that the debtor concealed his conversion of funds, refused to answer questions at trial and that his testimony was suspect because he was a convicted felon. No such criminal record was produced for Mr. Heilman, and this Court has found his testimony to be entirely credible.

In *Pleasants v. Black,* the district court reversed the bankruptcy court and held a debt of $32,815.52 to be nondischargeable on the grounds of embezzlement under a Virginia construction trust statute and fraud. There was no specific finding by either the district court or the Fourth Circuit that Mr. Black was acting in a fiduciary capacity.

**25.** It must at least be acknowledged that the statute under which Judge Williams held that a technical trust had been created was a Federal statute, and therefore on a par with the U.S. Bankruptcy Code.

In sum, this Court holds that the debtor custom home builder was not acting in a fiduciary capacity in relation to the plaintiffs in this case so as to render nondischargeable any debt owed by him to them because there was no express trust relationship between the parties that existed independently of the homebuilding contract, *CRL of Maryland v. Holmes (In re Holmes)*, 117 B.R. 848 (Bankr.D.Md.1990) (trust created in fact and not one implied by law is necessary for debt to be nondischargeable on the basis that it arises from a breach of fiduciary duty and therefore a contractor was held not to be a fiduciary to subcontractors under the Maryland Construction Trust statute for purpose of determining his debt to them to be nondischargeable.); *Hill v. Der (In re Der)*, 113 B.R. 218, 231 (Bankr.D.Md.1989) (one must be fiduciary under an express or technical trust to have discharge denied as to debt for fiduciary fraud under Section 523(a)(4), although debt of stockbroker was held to be nondischargeable for fraud). To the extent that the Maryland Custom Home Protection Act created a trust it was a trust *ex maleficio*, *Marchiando*, 13 F.3d 1111. The types of fiduciary capacity intended by Congress to render a debt nondischargeable are persons in positions of ultimate trust,[26] such as public officers,[27] executors,[28] administrators,[29] guardians,[30] trustees of express trusts,[31]

**26.** In *Andy Warhol Foundation*, 183 F.3d 162, 169 (2d Cir.1999), the Second Circuit discussed the meaning of "special trusts" in *Chapman* in holding that attorneys are fiduciaries for purposes of Section 523(a)(4): "Notably, the Court in *Chapman* spoke of 'special trusts' not in the modern sense of a legal relationship where a party (the trustee) is the legal owner of property beneficially held on behalf of others, but more generally of the class of relationships in which special trust is bestowed upon a party."

Unfortunately, the court incorrectly held that *Chapman v. Forsyth* does not require the existence of an express or technical trust. The quotation from *Chapman* that the Second Circuit interpreted to reach that conclusion could not be clearer:

The cases enumerated, "the defalcation of a public officer," "executor," "administrator," "guardian," or "trustee," are not cases of implied but special trusts, and the "other fiduciary capacity" mentioned, must mean the same class of trusts. The act speaks of technical trusts, and not those which the law implies from the contract. A factor is not, therefore, within the act.

43 U.S. at 208, 2 How. 202. The analysis of the holding in *Chapman* was flawed because the Second Circuit said that express trusts are different from technical trusts, when in fact they are the same. The reason the opinion is correct is that attorneys *are* fiduciaries in fact on a par with trustees when they are representing the interests of their clients. According to the *Restatement (Second) of Trusts*, §§ 6 and 7, executors, administrators or guardians are not trustees, but they *are* fiduciaries. *Id.*

The court pointedly stated: "Of course, the attorney-client relationship entails one of the highest fiduciary duties imposed by law." 183 F.3d at 167. As if that weren't enough, the attorney was representing the executor of a decedent's estate when he committed the defalcation. The plaintiff brought suit as sole beneficiary in place of the executor to recover exorbitant fees from the estate's attorney, who filed bankruptcy. Accordingly, the Second Circuit was correct in its holding that the attorney was acting in a fiduciary capacity, because it found that he was a fiduciary in fact when he committed the defalcation, conformable with the holding in *Chapman*.

**27.** *Orem Postal Credit Union v. Twitchell (In re Twitchell)*, 91 B.R. 961, 964 (D.Utah 1988), *rev'd*, 892 F.2d 86 (10th Cir.1989) (debtor as president and treasurer of a credit union was not a "public officer," defined as a person legally elected or appointed to exercise governmental functions, (citing Webster's New Collegiate Dictionary 925 (1979))).

**28.** *Peerless Ins. v. Swanson (In re Swanson)* 231 B.R. 145 (Bankr.D.N.H.1999); *Caldwell v. Hanes (In re Hanes)* 214 B.R. 786 (Bankr. E.D.Va.1997); *Dutton v. Kondora (In re Kondora)*, 194 B.R. 202 (Bankr.N.D.Iowa 1996).

**29.** *Hash v. Reed (In re Reed)*, 155 B.R. 169 (Bankr.S.D.Ohio 1993).

**30.** *Ohio Casualty Ins. Co. v. Hryhorchuk (In re Hryhorchuk)*, 211 B.R. 647 (Bankr.W.D.Tenn. 1997) (debtor who misappropriated funds as guardian of his minor children was liable to surety which paid on bond for his defalcation and debt was nondischargeable under (a)(4)).

**31.** *Rutanen v. Baylis (In re Baylis)*, 222 B.R. 1 (Bankr.D.Mass.1998); *Samuels v. Ellenbogen (In re Ellenbogen)*, 218 B.R. 709 (Bankr. S.D.N.Y.1998) (mere negligence on the part of

attorneys[32] and corporate directors.[33]

"Fraud" under this section has the same meaning as the term is used in Section 523(a)(2)(A). *See e.g., Lawrence Steel Erection Co., Inc. v. Piercy (In re Piercy)*, 140 B.R. 108 (Bankr.D.Md.1992); *Stanley Silverblatt Electrical Contractor, Inc. v. Marino (In re Marino)*, 139 B.R. 380 (Bankr.D.Md.1992). To reiterate, the type of fraud required to render a debt nondischargeable in bankruptcy is "positive fraud," "fraud in fact," "involving moral turpitude or intentional wrong." *Upshur v. Briscoe*, 138 U.S. 365, 11 S.Ct. 313, 34 L.Ed. 931 (1891); *Neal v. Clark*, 95 U.S. 704, 24 L.Ed. 586 (1877). The plaintiffs did not sustain their burden of proof of fraud under Section 523(a)(2)(A), and they have failed to do so under Section 523(a)(4) as well.

In reaching this result, this Court has resorted to the plain meaning of the Bankruptcy Code provision regarding fiduciary

---

a trustee of an express trust in the absence of intentional wrongdoing, breach of fiduciary duty or some other identifiable misconduct, does not constitute defalcation within the meaning of section 523(a)(4)).

**32.** *Andy Warhol Foundation*, 183 F.3d 162 (2d Cir.1999) (attorney was acting in fiduciary capacity as to client); *BCCI Holdings v. Clifford*, 964 F.Supp. 468 (D.D.C.1997); *Braud v. Stokes (In re Stokes)*, 142 B.R. 908 (Bankr. N.D.Cal.1992) (attorneys not liable as fiduciaries to clients for negligence); *Ducey v. Doherty (In re Ducey)*, 160 B.R. 465 (Bankr. D.N.H.1993) (attorney who defalcated retainer was fiduciary); *Ehlenbeck v. Patton (In re Patton)*, 58 B.R. 149 (W.D.N.C.1986) (attorney was fiduciary whose embezzlement of funds entrusted to him by client for purchase of real estate); *Harsch v. Eisenberg (In re Eisenberg)*, 189 B.R. 725 (Bankr.E.D.Wis. 1995) (ERISA violations by attorney who was pension plan administrator and trustee held breach of fiduciary duties); *Jacobs v. Pierce (In re Pierce)*, 208 B.R. 261 (D.Mass.1997) (debtor-attorney was fiduciary under Massachusetts law); *Koenig v. Grotrian (In re Grotrian)*, 217 B.R. 1017 (Bankr.N.D.Ind.1997) (attorney-client relationship is fiduciary one); *Schatz v. Rosenberg*, 943 F.2d 485 (4th Cir. 1991) (under Maryland law, lawyer owes duty only to client or third-party beneficiary of attorney-client relationship); *Kaufman v. Tallant (In re Tallant)*, 207 B.R. 923 (Bankr. E.D.Cal.1997), *rev. in part*, 218 B.R. 58 (9th Cir. BAP 1998) (attorney was not fiduciary but could be held liable for fraud or misrepresentation against client); *Tudor Oaks*, 124 F.3d 978 (attorney who represented partnership was fiduciary to partners; fiduciary status is question of Federal law); *Weisberger v. Guth (In re Guth)*, 210 B.R. 294 (Bankr. N.D.Ohio 1997) (attorney who agreed to share fees was not fiduciary to other attorney); *In the Matter of Woldman*, 92 F.3d 546 (7th Cir.1996) (two lawyers who were joint venturers were not fiduciaries to each other).

**33.** *Mercedes–Benz*, 219 B.R. 66 (principal of corporation was fiduciary to corporation's creditors upon insolvency of corporation); *M–R Sullivan*, 217 B.R. 670 (technical trust is one imposed law and may be created by state statute or common law; under Arizona law, a corporate officer or director owes a fiduciary duty to the corporation); *Miramar Resources, Inc. v. Shultz (In re Shultz)*, 208 B.R. 723 (Bankr.M.D.Fla.1997) (corporate director became corporate fiduciary when corporation became insolvent under Delaware trust fund doctrine); *Energy Products Eng'g*, 169 B.R. 398 (fiduciary duty of corporate officers and directors arises upon insolvency or dissolution of the corporation for purposes of nondischargeability of debt under 11 U.S.C. § 523(a)(4)); *Tricentrol Overseas*, 153 B.R. 955 (fiduciary duty of corporate officer to corporation as to corporate property gave rise to technical trust, rather than implied or constructive trust, so as to render debt nondischargeable as defalcation by a fiduciary). *Pan–Western Life Ins. Co. v. Galbreath (In re Galbreath)*, 112 B.R. 892 (Bankr.S.D.Ohio 1990) (corporate director was a fiduciary and his debt was nondischargeable); *LaPointe v. Brown (In re Brown)*, 131 B.R. 900 (Bankr. D.Me.1991) (corporate officer was fiduciary to corporation); *Gillespi v. Jenkins (In re Jenkins)*, 110 B.R. 74 (Bankr.M.D.Fla.1990) (*held*, debtor committed embezzlement but also committed defalcation while acting in a fiduciary capacity; debtor/president/sole shareholder of corporation was fiduciary to surety on public projects created by indemnity agreement, not by penal statute); *Bakis v. Snyder*, 101 B.R. 822 (fiduciary duties of corporate director under state law satisfied requirements of Section 523(a)(4)); *Mostiler*, 100 B.R. 802 (property management corporation and corporate officer who was 80% stockholder were fiduciaries for property owner and liable for defalcation); *Driggs*, 787 F.2d 503 (majority shareholder in corporation did not have fiduciary duty toward individual minority shareholder, but to all other shareholders as a group).

capacity as consistently interpreted by the Supreme Court and the more discerning lower courts. It is not legislating new law but merely attempting to revitalize the correct interpretation of venerable Federal case law on this subject through logical analysis of historical precedent. It does not invite wrongdoers to seek the shelter of the bankruptcy court to shield them from the consequences of their wrongdoing. Fiduciaries in fact will remain subject to having their debts determined to be nondischargeable based upon their defalcations. Other non-fiduciaries who commit fraud and misrepresentations will remain liable as well. Dishonest debtors will not get a free ride in bankruptcy under the rationale of this opinion.

The plaintiffs also cannot prevail under the second and third provisions of Section 523(a)(4) because they have failed to prove embezzlement or larceny. Embezzlement under Section 523(a)(4) has been defined as "the fraudulent appropriation of property by a person to whom such property has been entrusted or into whose hands it has lawfully come." *Brady v. McAllister (In re Brady)*, 101 F.3d 1165, 1172–73 (6th Cir.1996); *Brown v. Beckett (In re Beckett)*, 96 B.R. at 368, and *Gribble v. Carlton*, 26 B.R. 202, 205 (Bankr. M.D.Tenn.1982), (*quoting Moore v. United States*, 160 U.S. 268, 269, 16 S.Ct. 294, 295, 40 L.Ed. 422 (1895)). *See also O'Connor v. Booker (In re Booker)*, 165 B.R. 164 (Bankr.M.D.N.C.1994) ("Under federal law, embezzlement requires three elements. (1) property rightfully in the possession of a nonowner; (2) nonowner's appropriation of the property to a use other than that which it was entrusted; and (3) circumstances indicating fraud.").

Mr. Heilman was the lawful owner of the funds which were paid to him on behalf of his company. Therefore, Mr. Heilman's conduct did not constitute larceny because he came into lawful possession of the money. He was paid outright and not entrusted with money by the Spinosos. He was not required to dedicate every dollar received from the Spinosos to the construction of the house because in a commercial setting the parties intended that a portion of the contract price represent a profit for Mr. Heilman to realize from his work. Construction contracts typically do not delineate a profit margin, and in the absence of a specific designation in the written contract restricting the use of the money, Mr. Heilman was entitled to retain a reasonable amount of the funds for himself as builder. The contract between the parties did not earmark the $20,000 deposit paid by the Spinosos to an identifiable expense, and therefore, at least a part of it appears to represent his profit in the form of an "up front" payment, made by the Spinosos to demonstrate their good faith and the ability to fulfill their end of the agreement. Mr. Jobson testified that a typical profit for a builder was 16–19% of the contract price. The $20,000 deposit represented less than 10% of the contract price of $210,000. Mr. Heilman was in lawful possession of the draws because payment of a contract price in exchange for performance or the obligation to perform transfers ownership of the funds to the recipient. *Belfry v. Cardozo (In re Belfry)*, 862 F.2d 661 (8th Cir.1988). The testimony elicited from Mr. Jobson indicated that the draws were properly released to Mr. Heilman as work was actually performed.

Section 523(a)(6) excepts from discharge a debt arising from a "willful and malicious conversion." 124 Cong.Rec. H11,095–6 (daily ed. Sept. 28, 1978), $17,-412–13 (daily ed. Oct. 6, 1978). Conversion is defined as "an unauthorized exercise of dominion or control over property belonging to another that seriously interferes with the owner's rights." *First Nat. Bank of Maryland v. Stanley (In re Stanley)*, 66 F.3d 664, 668 (4th Cir.1995). *See also Sears, Roebuck & Co. v. Goycochea (In re Goycochea)*, 192 B.R. 847 (Bankr. D.Md.1996).

"Willful" means "deliberate or intentional." *Kawaauhau v. Geiger*, 523

U.S. 57, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998); (*First National Bank of Maryland*), 66 F.3d at 668; *St. Paul Fire & Marine Ins. Co. v. Vaughn*, 779 F.2d 1003 (4th Cir.1985); H.R.Rep. No. 595, 95th Cong., 1st Sess. 365 (1977), reprinted in 1978 U.S.C.C.A.N. 5963, 6320–21. "Malicious" means "wrongful and without cause or excuse." *St. Paul Fire & Marine Ins.*, 779 F.2d at 1008. "A successful cause of action pursuant to Section 523(a)(6) requires the plaintiffs to prove that the debt arose from willful harm done with the intent to cause injury." *Health and Welfare Plan for Employees of Southern Maryland Elec. Coop., Inc. v. Eagleston (In re Eagleston)*, 236 B.R. 183, 188 (Bankr. D.Md.1999) *(citing Kawaauhau v. Geiger, supra)*.

■ A mere technical conversion does not fall within the scope of Section 523(a)(6) either. A wrongful and intentional deprivation of another's property is required. *First National Bank of Maryland*, 66 F.3d at 668; *Sears, Roebuck*, 192 B.R. 847; *Nerco Coal Corp. v. Ball (In re Ball)*, 84 B.R. 410 (Bankr.D.Md.1988); *St. Paul Fire & Marine Ins.*, 779 F.2d 1003; *Dunkinson v. Ricketts (In re Ricketts)*, 40 B.R. 676 (Bankr.D.Md.1984). A technical conversion is not in and of itself a "willful and malicious injury." *Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 55 S.Ct. 151, 79 L.Ed. 393. The plaintiffs have failed to show that a conversion occurred, let alone one that was willful and malicious. *Id.*

■ Furthermore, Section 523(a)(6) requires that the nondischargeable debt arise out of a tort as opposed to a breach of contract. *See Snoke v. Riso (In re Riso)*, 978 F.2d 1151 (9th Cir.1992); *Cadillac Vending Co. v. Haynes (In re Haynes)*, 19 B.R. 849 (Bankr.E.D.Mich. 1982); *Barbachano v. Allen*, 192 F.2d 836 (9th Cir.1951). *But see Rivera v. Moore–McCormack Lines, Inc.*, 238 F.Supp. 233 (S.D.N.Y.1965).

Contrary to the plaintiffs' assertions, the draw schedule became a part of the contract and controlled the payments to Specialty as work was performed. Therefore, the release of draws to Mr. Heilman on behalf of Specialty by Northfield as progress payments during the course of construction was proper and are not recoverable by the plaintiffs. Assuming that the plaintiffs were entitled to recover anything from Mr. Heilman under the Maryland Custom Home Protection Act, they would have been limited to the $20,000 deposit, and not the cost to complete the contract.

Therefore, the plaintiffs have failed to prove that the debt is nondischargeable under the provisions of Section 523(a)(6) as having arisen from a "willful and malicious injury by the debtor."

For all these reasons, the complaint cannot withstand the debtors' motion to dismiss at the end of the plaintiffs' case.

WHEREFORE, the instant complaint will be DISMISSED WITH PREJUDICE pursuant to F.R.Civ.P. 41(b) and F.R.Bankr.P. 7041.

ORDER ACCORDINGLY.